GEDICKS, Plaintiff in error, v. STATE, Defendant in error.

*No. State 95. Submitted January 2, 1974.—Decided February 5, 1974.*
(Also reported in 214 N. W. 2d 569.)

78

For the plaintiff in error the cause was submitted on the briefs of *Jack W. Van Metre* of Madison, and for the defendant in error the cause was submitted on the brief of *Robert W. Warren,* attorney general, and *Steven B. Wickland,* assistant attorney general.

ROBERT W. HANSEN, J. By writs of error the defendant raises issues involving: (1) Sufficiency of the evidence; (2) testability of evidence relied upon by prosecution; and (3) reference to defendant's silence to impeach his testimony.

*Sufficiency of evidence.* On the issue of sufficiency of evidence, the defense offered testimony which, if believed by the court, would have required acquittal. However, the state offered credible evidence, believed by the court, which adequately sustains the conviction. The credibility of witnesses and the weight to be given their testimony is to be determined by the trier of fact.[1] As to the identification of defendant by the arresting officer, defendant would have us hold the identification "equivocal" and inherently incredible. It is neither. At the preliminary hearing, the officer testified that he could see defendant's profile reflected by light, but at the trial testified only that he observed defendant to be the shorter

---

[1] *State v. Hunt* (1972), 53 Wis. 2d 734, 750, 193 N. W. 2d 858, stating: ". . . It is well settled that the credibility of witnesses and the weight to be given to their testimony is to be determined by the finder of fact. . . ."

of the two persons he observed. However, at both preliminary and trial, he testified that he never lost sight of defendant and pursued him because he was the person he had seen throw the object through the window. The police officer estimated the distance between himself and defendant when he observed defendant throw an object through the window to be 55 feet. The estimate was impeached by evidence that the distance involved was 128 feet. An "expert" witness for the defense testified that, for the officer to make up the greater distance and keep the defendant within sight, he would have had to set a world's record for a sprint. The invitation is for us to hold, as a matter of law, that intervening yardage between pursuer and pursued requires holding that a pursuing officer, not following closely on the heels of person pursued, cannot be certain that the person running away from a turned corner is the person who ran up to the corner. What is involved is a question of fact, not law, to be determined by the trier of fact in regard to all facts and circumstances present. The officer's testimony was not inherently incredible, as it would have to be for its rejection to be rendered.[2] As to the conflict in testimony between the two expert witnesses on the match-up of the two pieces of cloth and the gasoline on gloves and glass, it is enough to state that this not unusual battle between experts was for the trier of fact to resolve.[3] On this record, the conviction is amply sus-

---

[2] *State v. Chacon* (1971), 50 Wis. 2d 73, 75, 183 N. W. 2d 84, stating: ". . . Unless this court can say as a matter of law the police testimony was inherently incredible, we are bound by it because the testimony was accepted by the trial court. . . ."

[3] *State v. Hebard* (1971), 50 Wis. 2d 408, 424, 425, 184 N. W. 2d 156, stating: ". . . The conflict in expert testimony is apparent. The question of which experts were to be believed was for the jury to determine."

tained by credible evidence which the trier of fact was entitled to accept and believe.[4]

*Testability of state's evidence.* Gloves worn by defendant, the cloth "mask" he had with him, glass fragments and the cotton cloth piece used as a "wick" in the bottleneck, and other items were submitted by the state to the state crime laboratory for analysis. Tests were conducted, including a gas chromatography test on vapors taken from the gloves, bottleneck "wick" and glass fragments. Since the containers containing these items were left unsealed, when they were delivered to the consulting chemist retained by the defendant, he could not conduct a second vapor test because the vapors had evaporated. The results of the state crime laboratory vapor testing were furnished the defense expert, and he based his conclusions and testimony on such test. Defendant submits that the inability of his expert to make a second vapor test denied him a fair trial. Where evidence is scientifically analyzed and then lost, unintentionally or in the absence of bad faith, the result of the analysis is still admissible at trial.[5] The fact of inadvertent destruction or loss goes to weight of the evidence rather than to its admissibility.[6] If objection had been made to the intro-

---

[4] *State v. Chacon, supra,* at pages 75, 76, stating: ". . . Since the trial court had the right to accept the testimony of the police and reject the testimony of the defendants, this court on appeal is to determine only whether the trial court acting reasonably could be convinced beyond a reasonable doubt by the evidence it thought credible. . . ."

[5] *United States v. Sewar* (9th Cir. 1972), 468 Fed. 2d 236, certiorari denied (1973), 410 U. S. 916, 93 Sup. Ct. 972, 35 L. Ed. 2d 278 (blood sample inadvertently disposed of).

[6] *United States v. Love* (5th Cir. 1973), 482 Fed. 2d 213 (chemical exhausted during test) ; *People v. Hitch* (1973), 106 Cal. Rptr. 606 (good-faith intentional destruction of test ampule in breathalyzer test) ; *People v. Noonan* (1971), 20 Cal. App. 3d 862, 98 Cal. Rptr. 125 (failure to preserve routinely destroyed test ampule) ; *State v. Sprout* (Mo. 1963), 365 S. W. 2d 572 (bloodstained

duction of the state crime laboratory testing, it would have been properly overruled. We note that no such objection at time of trial was made. In fact, when the state moved to admit the exhibit involved, defense counsel stated, "I would join and add thereto the two vials containing the expended matches." Defendant cannot fault the trial court for doing what it joined in requesting the trial court to do.

*Reference to silence.* The defendant claims error in the admission of testimony that he did not respond when the security officer asked him who he was and what he was doing there. The officer testified that he asked defendant for an ID card, asked who he was and what he was doing there. The defendant testified that the officer asked him only what he was doing there. Both testified that the defendant made no answer to the question or questions asked. Additionally, the defendant testified that he did not respond or tell the officer about the two men he claims to have seen running past because he was confused and because the officer's grabbing his poncho or sweat shirt created a pressure around his neck that made it impossible for him to speak.

The defendant now sees the admission of this testimony as a prosecutorial use of his standing mute prohibited by the *Miranda* decision.[7] But *Miranda* specifically exempts general, on-the-scene police interrogation.[8] Under the

pieces of defendant's trousers inadvertently lost); *United States v. Pullings* (7th Cir. 1963), 321 Fed. 2d 287 (inadvertent destruction of analyzed narcotics).

[7] *Miranda v. Arizona* (1966), 384 U. S. 436, 468 (footnote 37), 86 Sup. Ct. 1602, 16 L. Ed. 2d 694, stating: ". . . The prosecution may not . . . use at trial the fact that he stood mute or claimed his privilege in the face of accusation. . . ."

[8] *Id.* at page 477, stating: "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . ."

circumstances, that is all that the officer's request that defendant identify himself and his reason for being there amounted to.[9] Of course, defendant's failure to respond was no admission of guilt of the crimes of attempted arson or possession of a fire bomb.[10] However, when questions were asked and answers given as to on-the-scene interrogation and lack of response, defendant did not object. At least he did not object when the first questioning took place. It was only during a third series of inter-

[9] *Britton v. State* (1969), 44 Wis. 2d 109, 112, 113, 170 N. W. 2d 785, summarizing fact situation, stating: "Shortly after the shooting occurred, officer Larry Paul arrived on the scene and observed the victim lying on the sidewalk. A fourteen-year-old boy, at the scene, told the officer the assailant had just run into a gangway between two nearby houses. The officer ran into the gangway and when he reached the rear saw a man coming out of a doorway. The officer asked him if he had been involved in the shooting that had just taken place out front. The man answered, 'Yeh, I shot him.' The defendant was then placed under arrest. The defendant's version of this incident is similar except as to the manner in which the officer was holding his gun. . . ." And, at page 113, stating: ". . . The question, 'Were you involved in the shooting?' was not asked in the setting or atmosphere with which *Miranda* was concerned but occurred prior to custodial interrogation. The officer had not proceeded beyond general on-the-scene questioning which is specifically exempted in *Miranda*."

[10] *See: Galloway v. State* (1966), 32 Wis. 2d 414, 425a (on rehearing), 145 N. W. 2d 761, 147 N. W. 2d 542, citing *Riger v. State* (1946), 249 Wis. 201, 23 N. W. 2d 456, holding inadmissible testimony concerning defendant's refusal to answer a police officer's question concerning a date defendant had allegedly made with a complaining witness, but also holding, " 'the admission of this testimony could not have been prejudicial to the defendant.' " *See also: State v. Rice* (1967), 37 Wis. 2d 392, 397, 155 N. W. 2d 116, certiorari denied, 393 U. S. 878, 89 Sup. Ct. 180, 21 L. Ed. 2d 152, citing *Gullickson v. State* (1950), 256 Wis. 407, 411, 41 N. W. 2d 291, stating: " 'Evidence of admissions by silence is to be received with caution and the question of whether under all the conditions and surrounding circumstances a normal person would make denial so that silence can be interpreted as an admission at all, is for the jury.' "

rogations on the point that defense counsel objected, and then solely on the ground of immateriality. When objection is not made to the initial introduction or, at least, when the objectionable nature of the testimony is apparent, the right to subsequently object to the introduction of such testimony has been lost.[11] The right to object on appeal to what was not objected to initially, at time of trial, is waived.

On this record, in this case, more is involved than not responding to a question or questions asked by a police officer. The defendant's account of his noninvolvement in the crimes committed on the morning in question depended, crucially, on his establishing that the officer's testimony, that the defendant was the man he saw throw an object into the ROTC building and the man he chased, was mistaken. So the defendant sought to raise a reasonable doubt that he was, in fact, the man the officer pursued. This went beyond his testimony of going to the scene of arrest to locate a pair of missing glasses to include his testimony that he saw two men run by who were the ones the officer was really chasing. Given this testimony, it was an entirely reasonable expectation that one watching two pursued men rush by would inform their pursuer of what he had seen. The oft-used line in the western movies, "They went thataway," is not only commendable cooperation with law officers, but a prompt disassociation of the observer from those persons being pursued. Anticipating that a trier of fact might wonder why a person observing such chase would not promptly inform the pursuing officer that he had seen two men

---

[11] *State v. Hebard, supra,* page 425, footnote 3, stating: ". . . The failure to object to the initial question constitutes waiver. . . ." *See also: Bennett v. State* (1972), 54 Wis. 2d 727, 735, 196 N. W. 2d 704, stating: "An objection must be made to the introduction of evidence as soon as the adversary party is aware of the objectionable nature of the testimony. Failure to object results in a waiver of any contest to that evidence. . . ."

run by, the defendant testified on direct examination that he would have told the officer about the two runners but that poncho pressure about his neck prevented him from speaking at all. His testimony, regardless of questions asked, is that he would have volunteered a statement about the two runners if he had been able to do so. That the trier of fact believed none of his testimony as to his reason for being on the scene or for not telling the officer what he had seen does not change the nature or purpose of offering such testimony as to being involuntarily temporarily silenced. Defendant used this brick to complete the wall of his defense. The brick he used in the building is the very same brick that he now claims to have been improperly introduced into the case. Where the defendant himself, on direct examination, put into the record his explanation as to why he remained silent, he cannot complain that the testimony he offered was made part of the record. The stone the builder accepted at time of trial cannot be rejected by him at time of appeal.

*By the Court.*—Judgment and order affirmed.