WEST, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–484–CR. Argued October 4, 1976.—Decided November 16, 1976.*
(Also reported in 246 N. W. 2d 675.)

For the plaintiff in error there were briefs by *Howard B. Eisenberg,* state public defender, and *Jack E. Schairer,* assistant state public defender, and oral argument by *Mr. Schairer.*

For the defendant in error there was a brief by *Bronson C. La Follette,* attorney general, and *Thomas J.*

*Balistreri,* assistant attorney general, and oral argument by *Maryann Calef,* assistant attorney general.

DAY, J. On February 12, 1975, a jury convicted the plaintiff in error (hereinafter defendant) of armed robbery while masked contrary to secs. 943.32 (1) (a) and (2) and 946.62, Wis. Stats. He was sentenced to not more than three years in the state prison. Defendant's motion for a new trial was denied.

The primary questions raised on appeal are:

1. Was the defendant's arrest supported by probable cause?

2. Did the trial court err in excluding a police officer's testimony as to exculpatory statements made in jail by two accomplices?

3. Whether calling as state witnesses two accomplices who the state knew would invoke testimonial privilege was error.

4. Did an accomplice's refusal to answer certain questions on grounds of testimonial privilege deny the defendant the right to confront his accuser?

On the evening of November 11, 1974 a woman employee was working at a grocery store in Janesville. Two men wearing ski masks which covered their faces entered the store, one brandishing a firearm. She was told to lie down on the floor and then ordered to get up to open the cash register after the intruders were unable to do so. When she once again started to lie down one of them struck her. The two men left as the store manager walked in from the back room. A customer who was present said, "I think you were just robbed." The manager called the police.

Janesville police officer Lloyd M. Brueggeman was in route to the scene in response to a radio dispatch when he observed a 1965 light blue Chevrolet with a large dent in the left-rear quarter panel. His suspicions were aroused

because the car's rear license plate was partially bent obscuring the number. · He followed the vehicle. His suspicion was further aroused because a person in the rear seat kept looking back. The car stopped in front of a house at One Saint Mary's Court in Janesville. Officer Brueggeman saw four individuals around the car. One appeared to throw something toward the Rock River. The four, one of whom the police officer later identified as the defendant, walked into the house.

Officer Brueggeman then started to drive to the scene of the robbery. In route, the police dispatcher inquired by radio if the car he had observed moments earlier was light blue and had a large dent. He answered affirmatively. He was ordered to return to One Saint Mary's Court. A witness, Claudia Kuxen, had described a blue dented vehicle to other officers investigating at the scene of the robbery.

Mrs. Kuxen had been waiting for her husband to return to their home on Milton Avenue, across the street from the grocery store. When she went to the window to see why her dog was barking, she observed someone bending toward the license plate of a blue car with a dent in the rear panel. This was the description put out on the police radio.

The police then converged on One Saint Mary's Court where Patrolman Brueggeman was maintaining surveillance of the car which matched that description.

The police entered the home within ". . . a period of time in excess of a few minutes" after their arrival, according to a statement at oral argument by defendant's counsel.[1] The circumstances of the entry, as reflected in the record, are as follows.

The robbery occurred around 7:00 p.m. An accomplice, Russell Leudeking testified that the police converged on

---

[1] This interpretation of the facts represents a departure from the defendant's brief to this court where it is stated the police waited "several hours" before entering the home.

the house within 13 or 14 minutes of the robbery and within four or five minutes of the robbers' own return. Officer Brueggeman testified he picked up a gun holster in the living room at approximately 7:45 p.m.

Officer Gary Hilt testified that he proceeded to the home at approximately 7:40 p.m. This was his second visit. At around 6:00 p.m. that evening he had gone to the house to pick up a runaway girl.

Police Sergeant Peter Peloquin supervised the police entry. He arrived at the house around 7:25 p.m. He called in six or seven other patrol units. He testified: "(W)e maintained surveillance at the rear of the house for possible exits from the house, and myself and several other officers went to the front door of the house."

Sergeant Peloquin knocked. As the defendant walked to the door to answer, Russell Leudeking, who subsequently admitted his role in the robbery, said, "Don't let them in." The defendant and another occupant, Barbara Green, came to the door. Sergeant Peloquin told them that he suspected the car parked in front of the house was connected with the robbery and he desired to talk with the male occupants of the house. The defendant asked if he had a warrant and said that only he and Ms. Green were present. Sergeant Peloquin replied that he did not need a warrant because he felt that the circumstances were "exigent at the time." The defendant testified that he responded, "Sure, come on in."

The police entered. The defendant was identified by Officer Brueggeman. Five suspects including one juvenile were arrested. These included the four persons ultimately charged with the robbery, Mark Olson, Russell Leudeking, Alan Poteet (occasionally spelled "Poteat" in transcript) and the defendant. In addition, the police found on this entry the empty holster and a .44 magnum shell.

Later in the evening the police returned to the house with the defendant who consented to a house search while

still in custody. At this time a .44 revolver and loose money were found. After the search the defendant was taken back to the jail.

At midafternoon of the next day, November 18, the defendant was released from custody at the direction of the district attorney. By 10:00 p.m. of that same day he was rearrested because Russell Leudeking, still in custody, had made a statement to police that the defendant was the driver of the getaway car.

At defendant's trial, Mr. Leudeking testified that he was promised a recommendation of probation if he cooperated with the state. He said he planned the crime with the defendant and the other alleged participants, Alan Poteet and Mark Olson. He also said Mr. Olson had suggested to him that they not implicate the defendant who could get in "great trouble." During the robbery the defendant remained in the car as a lookout. Mr. Leudeking further testified that he knew that the police were following the car when they left the grocery store to return to One Saint Mary's Court. When they arrived at the house, he said, "We all remained as cool as we could and just started our way toward the house."

The defendant agrees he walked into the house at the time Officer Brueggeman was watching, but said he had been sitting by the river recovering from the effects of a lot of drinking earlier that day. When the car pulled up he got up to greet the others and walked into the house with them. He was neither a participant in the crime nor an occupant in the car, he said.

Michael D. Mengelt, in jail on an unrelated matter, was called by the defense to impeach the credibility of the state's witness Leudeking. He testified that Leudeking told him he didn't care what happened to the other defendants and he would do anything to save himself.

Four days after the robbery, Janesville Detective Sergeant Howard Deyer was visiting the Rock county jail on

a matter unrelated to the robbery when inmates Olson and Poteet requested to see him. Detective Deyer interviewed them separately and told each he was not investigating the robbery. He advised them they had a right to have counsel present when talking but if they wished to volunteer a statement, he would listen. Both Poteet and Olson told him the defendant was not involved in the robbery. All of the foregoing was established by the testimony of Detective Deyer by way of an offer of proof at trial. The court ruled the testimony to be hearsay not subject to the "recent perception" exception of sec. 908.045 (2), Stats. and therefore inadmissible.

Both Mr. Olson and Mr. Poteet were called to testify. Both were asked what they were doing the night of the robbery. Both invoked their privilege against self-incrimination and were excused.

## PROBABLE CAUSE FOR ARREST

■ The defendant contends the police did not have probable cause to arrest him. The preliminary hearing was held November 27, 1974.[2] The motion to dismiss was filed December 13, 1974, alleging lack of probable cause to arrest. A hearing was held in circuit court in which Judge Luebke stated the issue was whether there were "sufficient circumstances" to issue the complaint. The motion was untimely. An arrest made without probable cause raises a question of jurisdiction over the person which is waived if not timely raised. *Lampkins v. State* (1971), 51 Wis.2d 564, 570, 571, 187 N.W.2d 164.

Had the motion been timely we would hold the arrest proper. Probable cause to arrest the defendant the second time was supplied by Russell Leudeking's in-custody statement and that statement was the fruit of the first arrest in the defendant's home. Defendant argues on

---

[2] The transcript of the preliminary is not in the record.

appeal that his second arrest is the "fruit of the poisonous tree," the "tree" being the first, warrantless arrest.

The first arrest was valid if (1) the police had probable cause to arrest and (2) the police were entitled to effect the arrest in the defendant's home.

■■ A warrant is not required to effect an arrest if the arresting officer has probable cause. *Rinehart v. State* (1974), 63 Wis.2d 760, 766, 767, 218 N.W.2d 323. *United States v. Watson* (1976), 420 U.S. 411, 96 S. Ct. 820, 824, 46 L. Ed.2d 598. Probable cause to arrest exists if the officer acts on information which would lead a reasonable police officer to believe that the defendant probably committed a crime.[3]

■ We hold there was probable cause to suspect that the occupants of the blue Chevrolet who were seen exiting the car and entering the house were the same persons who robbed the store at gun point. The police obtained this information as a result of quick, efficient work. Officers at the robbery scene obtained a description of a blue and dented automobile that was parked in front of the store at about the time of the robbery. Independent of this investigation, Officer Brueggeman had followed a car matching that description, his own suspicions aroused because of the bent license plate and the rear window glances by an occupant. Because the officer had seen the car's occupants enter the house at One Saint Mary's Court and with the knowledge of the police acquired at the scene of the robbery, a "reasonable policeman" would have probable cause to believe the robbers were in that house. Thus, probable cause to arrest existed when the other officers converged on the house. The next question is whether they could enter the house.

---

[3] "968.07. *Arrest by a law enforcement officer.* (1) A law enforcement officer may arrest a person when:

"(d) There are reasonable grounds to believe that the person is committing or has committed a crime." *Also see, Rinehart, supra,* 63 Wis.2d at 764.

In the case of *Warden v. Hayden* (1967), 387 U.S. 294, 87 S. Ct. 1642, 18 L. Ed.2d 782, an armed robber ran from a cab company followed by two cab drivers who saw him enter a house. The police responded within minutes, entered the house and arrested the suspect. While it was clear in that case the police were given permission to enter, the court went on to hold that the exigency of the situation justified the warrantless entry to search for the suspect.

The court in *Warden* said:

"We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, 'the exigencies of the situation made that course imperative.' . . . The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.
" . . .
"Here, the seizures occurred prior to or immediately contemporaneous with Hayden's arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived. The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape." 387 U.S. at 298, 299.

■ Here as in *Warden,* the exigencies of the situation made the course which was taken imperative. Men be-

lieved to have committed an armed robbery had entered the house only minutes before. The defendant said at the door that only he and Ms. Green were present though the police officer saw four men enter. The safety of other possible occupants of the house and the need to minimize the possibility of flight or armed resistance justified the undelayed entry in the case before us.

■ The doctrine of exigency is "founded upon the actions of police which are considered reasonable. The element of reasonableness is supplied by the compelling need to assist the victim or apprehend those responsible, not the need to secure evidence." *State v. Pires* (1972), 55 Wis.2d 597, 604, 201 N.W.2d 153; *State v. Davidson* (1969), 44 Wis.2d 177, 194, 170 N.W.2d 755. Such a compelling need was demonstrated in this case.

## EXCLUSION OF ACCOMPLICES' STATEMENTS TO POLICE

■ The defendant argues that Officer Deyer's proffered testimony of Olson's and Poteet's exculpatory statements fit the hearsay exception of sec. 908.045, Stats.[4]

Invoking testimonial privilege by a witness makes him unavailable within the meaning of the statute.[5]

---

[4] "908.045. *Hearsay exceptions; declarant unavailable.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(2) *Statement of Recent Perception.* A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear."

[5] "908.04. *Hearsay exceptions; declarant unavailable; definition of unavailability.* (1) 'Unavailability as a witness' includes situations in which the declarant:

■ Mr. Leudeking's statement that Mr. Olson had said they should not implicate the defendant because the defendant could get in trouble if they did showed a desire on Olson's part to help a friend who had been involved. The court had a right to believe Mr. Leudeking and thus the element of good faith in making such statement was lacking. The court did not err in excluding Detective Deyer's testimony.

## CALLING WITNESSES WHO INVOKE THE PRIVILEGE AGAINST SELF-INCRIMINATION

Calling Messrs. Olson and Poteet to the stand was not error.

■ First, as the state points out, defendant's trial counsel did not object to calling the witnesses, though in the case of Olson at least, counsel had fair warning he would refuse to testify. To be timely an objection must be made as soon as the party is aware of the objectionable nature of the testimony.[6]

■ ■ No error is committed merely by calling a witness who will claim the privilege. *Price v. State* (1967), 37 Wis.2d 117, 126, 154 N.W.2d 222, cert. den. 391 U.S. 908. What is forbidden is the conscious and flagrant attempt to build a case out of inferences arising from use of the testimonial privilege. *Id.,* 37 Wis.2d 127. That did not occur in this case. Olson and Poteet were each asked their name and address and their whereabouts on the evening of the crime. Each was then excused. Even if the prosecutor knew the witnesses would invoke the privilege, the brief testimony did not add "critical weight" to the prosecution's case. *Id.,* at 126.

"(a) Is exempted by ruling of the judge on the ground of privilege from testifying concerning the subject matter of his statement; . . ."

[6] *Bennett v. State* (1972), 54 Wis.2d 727, 735, 196 N.W.2d 704.

## CROSS-EXAMINATION OF STATE'S WITNESS AS TO DRUG USE

The defendant's appellate counsel alleges the defendant's right to confront his accuser was denied him when accomplice Leudeking refused to testify whether he took drugs the night of the robbery. Defendant's trial counsel asked the question concerning drugs. Leudeking's counsel, who was present at defendant's trial, objected. Defense counsel said, "He can take the fifth if he wants to, Judge."

Whether a witness' refusal on fifth amendment grounds to answer otherwise permissible questions violates the defendant's sixth amendment right to confrontation must be determined from the whole record. *U. S. v. Rogers* (7th Cir. 1973), 475 F.2d 821, 827.

Certainly Leudeking's ability to perceive the events about which he testified was a proper subject of cross-examination. But looking through the whole record, it can be seen that Leudeking's credibility and perception were adequately tested. His credibility was attacked on subjects ranging from his bargain with the prosecutor to the possibility that he had been unfaithful to his wife. In addition, the defense called a witness to testify solely on the matter of Leudeking's credibility. Leudeking himself was asked whether this recollection was clear. Whatever the jury would have learned concerning Leudeking's suggested drug use on the night in question, it would not have had a substantial influence on the ultimate verdict. This is because his recollection of the events of that night was tested by detailed cross-examination; as the court said in *Rogers, supra,* pp. 826, 827:

"A key witness for the Government was Karen Knauf a co-participant in the crimes charged. . . . During cross-examination, she refused to answer certain questions on the grounds that the answers might tend to incriminate

her . . . while admitting that she was using drugs during the period in which she cashed the money orders, she refused to say which drugs she used, how extensively she used them, and who supplied them . . . . On appeal, Rogers presses only one point . . . . He argues that while the witness was within her rights in refusing to answer questions directed to her drug use, by her so doing Rogers was precluded from establishing that the witness' ability to observe and remember the events about which she testified was impaired . . . . Rogers contends such ability goes to the reliability of the witness' entire direct testimony . . . . A witness' refusal on Fifth Amendment grounds to answer otherwise permissible questions may, but need not necessarily, violate the defendant's Sixth Amendment right as to part or all of the witness' testimony . . . . Such a judgment is to be made upon the whole record, and, on the record in the instant case, we conclude that Rogers' right to cross-examination was not so limited as to warrant striking Knauf's testimony . . . . In general terms, the truthfulness of Knauf's testimony, including her ability to observe and remember events, was broadly and incisively attacked in depth . . . and the witness' 'refusal to answer (did not add) critical weight to the prosecution's case in a form not subject to cross-examination . . . .' "

▮ We conclude the defendant was not denied the right adequately to confront his accuser.

## OTHER ALLEGED ERRORS AT TRIAL

▮ The defendant raises for the first time on appeal the argument the information included a charge of being masked contrary to sec. 946.62, Stats.,[7] a charge that

[7] "946.62. *Concealing Identity.* Whoever commits a crime while his usual appearance has been concealed, disguised or altered, with intent to make it less likely that he will be identified with the crime, may in addition to the maximum punishment fixed for such crime, in case of conviction for a misdemeanor be imprisoned not to exceed one year in county jail, and in case of conviction for a felony be imprisoned not to exceed 5 years."

had been dismissed at the preliminary hearing. The defendant cites sec. 970.03 (10) Stats.[8] The issue not having been raised before trial by motion, it is waived.[9] It is important that such issues be raised while there is opportunity for the state to amend the information.

The defendant also argues insufficiency of the evidence because the verdict names the defendant as a principal to the crime of armed robbery while masked rather than as a party to the crime.[10]

The court's charge to the jury properly stated the theory of the case. Specifically, the court instructed on the elements of sec. 939.05 stating, "Now obviously I will have to instruct you on aiding and abetting in this situation, since the state does not claim the defendant was

[8] "970.03. *Preliminary Examination.* (1) A preliminary examination is a hearing before a court for the purpose of determining if there is probable cause to believe a felony has been committed by the defendant.

". . .

"(10) In multiple count complaints, the court shall order dismissed any count for which it finds there is no probable cause. The facts arising out of any count ordered dismissed shall not be the basis for a count in any information filed pursuant to ch. 971. Section 970.04 shall apply to any dismissed count."

[9] "971.31(2). *Motions before trial.* Except as provided in sub. (5), defenses and objections based on defects in the institution of the proceedings, insufficiency of the complaint, information or indictment, invalidity in whole or in part of the statute on which the prosecution is founded, or the use of illegal means to secure evidence shall be raised before trial by motion or be deemed waived. The court may, however, entertain such motion at the trial, in which case the defendant waives any jeopardy that may have attached. The motion to suppress evidence shall be so entertained with waiver of jeopardy when it appears that the defendant is surprised by the state's possession of such evidence."

[10] "939.05(1). *Parties to crime.* Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act."

inside the store at the time the alleged robbery occurred." Because the court properly instructed that under sec. 939.05 the defendant could be convicted of the commission of the crime, the recitation of that crime in the verdict did not prejudice the defendant. The state consistently put forward a party to the crime theory in its case.

To the extent the verdict was erroneous because it, unlike the proof and the instructions, did not contain the party to the crime language, the error was harmless.

*By the Court.*—Judgment and order affirmed.