SIMPSON, Plaintiff in error, v. STATE, Defendant in error.

No. 76–038–CR. Argued February 8, 1978.—
Decided June 6, 1978.
(Also reported in 266 N. W. 2d 270.)

---

[7] Mullaney v. Wilbur, 421 U.S. 684 (1975); Patterson v. New York, 432 U.S. 197 (1977).

For the plaintiff in error there were briefs by *Howard B. Eisenberg*, state public defender, and *Ronald L. Brandt*, deputy state public defender, and oral argument by *Mr. Brandt*.

For the defendant in error the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

BEILFUSS, C. J. The charge in this case arose from an incident which occurred on January 11, 1975, when the victim, Mary Bell, was seriously wounded in the head by a shotgun blast. The shooting took place in a bedroom of the upper flat which the defendant and the victim shared at 3053 North 11th Lane in Milwaukee.

The defendant's mother, Rosie Simpson, who lived in the downstairs flat with two of her grandsons, testified that at approximately 8:45 p.m., on that date, she was watching television with one of the grandsons when she heard a noise from upstairs. She went up to investigate and saw her son, the defendant, standing in the kitchen. She asked him what happened. He replied he had just killed Mary.

Mrs. Simpson then looked into the bedroom and saw Mary Bell lying on the floor next to the bed. The defendant's mother then went downstairs and sent her grandson for help. Police Officers Lee Eschweiler and Paul Wroblewski arrived on the scene just as Thomas Simpson, Jr., the defendant's son, arrived in response to a call from his grandmother. Mrs. Simpson let them in and led them to the upstairs flat. Both officers testified they told the defendant's son to remain downstairs while they went up to investigate.

When they reached the upstairs flat, Officer Eschweiler asked the defendant, who was standing in the kitchen with his arms crossed, what had happened. Eschweiler testified the defendant answered, "We had an argument, and I shot her." Wroblewski, in the meantime, found Mary Bell lying on the floor in the bedroom. The defendant was then placed under arrest for murder because, according to Eschweiler, the victim appeared to be dead. Eschweiler then advised the defendant of his constitutional rights.

Eschweiler also testified that he later discovered a loaded 16-gauge shotgun with its safety off under the bed in the other bedroom, along with several shotgun shells. Eschweiler stated that he recovered the shotgun from under the bed in such a manner so as to preserve any fingerprints which might have been on it. The officer also testified that he saw no powder burns on the victim.

Officer Wroblewski testified that after the defendant's mother let them in she appeared quite upset, repeatedly crying, "Oh, my God, oh my God, Thomas shot Mary." Wroblewski observed that the victim had a rather large wound to the left side of her head and that the victim's head was lying in a large pool of blood. He saw no powdery substance near the wound. Wroblewski found a spent shotgun shell on the floor in the bathroom area adjoining the bedroom where the victim was lying.

Detective Alan Quosig arrived at the scene to investigate the shooting. He retrieved shotgun pellets from the wall, bed and floor of the bedroom. He checked the shotgun for fingerprints but found none. He testified that the gun appeared to have been wiped clean. Quosig also testified that he had been present at the "charging conference" in the district attorney's office on January 13, 1975, and had heard the defendant say that there was a struggle over the gun and that there would be fingerprints on it.

Dr. Bruce Bressler, a neurosurgeon, testified he examined and treated Mary Bell when she was brought to the emergency room at the hospital. According to Dr. Bressler, the victim's wound was on the left side of her head starting immediately behind her left eye and extending horizontally toward the back of her head. The wound was "fairly clean" in the front but expanded and was more destructive as it extended backwards with fragmented tissue, hair and brain matter being visible. From these observations the doctor concluded the shot came from the front of the victim's head. After initial resuscitation efforts Dr. Bressler performed surgery on the victim and removed 20 to 40 shotgun pellets from the wound. The victim remained in critical condition for several weeks following the surgery.

Dr. Bressler testified that as a result of the shotgun wound Mary Bell suffered permanent injuries, including paralysis of the entire right side of her body, with her upper extremity being more severely impaired than the lower extremity. She has double vision and difficulty focusing her eyes. The part of her brain which controls both the reception and expression of written and spoken material was damaged, as well as that part of her brain concerning memory. In Dr. Bressler's opinion, it would be highly unlikely that Mary Bell could recall the events giving rise to her injuries and that, in any event, she was unable to communicate or understand questions.

Dr. Bressler also testified that neither he nor any other treating physician noted any powder burns on Mary Bell during her course of treatment at the hospital. He described a gun powder burn as damage or carbonization to the skin which occurs when a firearm is fired. It is a dark, blackened area resembling a burn surrounding a missile wound. The burn would look like a solid black mark if the wound is incurred at close range, but would look increasingly "peppery" as the range was increased. According to Dr. Bressler, skin damaged by

powder burns is generally removed so as to promote proper healing and prevent infection. Dr. Bressler testified it was not necessary to remove any powder burned skin from Mary Bell because she had none. He stated there was nothing in Mary Bell's record of her hospitalization indicating that she had been treated for powder burns or that any other doctor had noted powder burns on her.

Allan Wilimovsky, a firearms expert from the Wisconsin Department of Justice, State Crime Laboratory, testified that he had tested the shotgun which had been recovered from the defendant's apartment and found that it could only be fired by pressing the trigger with at least four and one-fourth pounds of pressure. After conducting several pellet spread pattern tests with this shotgun, and based on the absence of powder burns on the victim, Wilimovsky concluded the muzzle of the gun must have been at least four feet from the victim's head at the time she was wounded. Additionally, based on the physical evidence he examined, Wilimovsky testified the shotgun was fired from the southwest corner of the bedroom, diagonally toward the northeast corner.

Thomas Simpson, Jr., the defendant's son, testified on behalf of the defense. He contradicted the police officers' story by claiming that he preceded them upstairs, that his father refused to speak until afforded counsel, and that he never heard his father tell the police that he and Mary had had an argument and that he (the defendant) shot her. The defendant's other son, James Simpson, who arrived at the scene later, claimed that he heard his father state that he would remain silent until he contacted an attorney. Both sons testified their father was calm, not excited or hysterical, when they saw him in the kitchen after the shooting.

The defendant testified in his own behalf. He stated he had known Mary Bell for two years and was living

with her on January 11, 1975. The defendant described their activities on the day of the shooting as normal and routine. He stated that at approximately 8 p.m., Mary Bell suddenly became angry with him for having stayed out all night earlier that weekend. She ran into the west bedroom and grabbed the loaded shotgun he kept in the closet. According to the defendant, he followed her and tried to take the gun away but slipped and fell. She ran to the other bedroom taking the gun with her. He again followed and struggled with her over the gun. The defendant testified that during this struggle the gun went off, with the shot striking Mary Bell on the left side of the head. At trial the defendant re-enacted the struggle in an in-court demonstration and indicated that the muzzle of the gun was within six inches of the victim's head when the gun was fired.

The defendant further testified that after the shot he hid the gun under the bed in the west bedroom. He stated his mother came upstairs and he told her to get help because Mary had been hurt. According to the defendant, the next person he saw was his son, Thomas, Jr., followed by Officers Eschweiler and Wroblewski. He stated he was crying and in a state of shock when the police arrived.

The defendant denied stating that he and Mary had an argument and that he shot her. He further denied that he was hot-tempered or jealous. On cross-examination the defendant specifically denied threatening Mary Bell at the Masterpiece Lounge four months prior to the shooting.

On rebuttal the prosecution called Yvonne Harper, Mary Bell's niece, as a witness. Ms. Harper described the incident at the Masterpiece Lounge and stated that she had heard the defendant threaten to kill Mary Bell at that time.

504

On surrebuttal the defendant gave his version of the Masterpiece Lounge incident and again denied threatening Mary Bell on that occasion.

The jury was instructed and, after about twenty minutes of deliberation, returned a verdict of guilty.

Thereafter the defendant was sentenced to an indeterminate twenty-year term which was subsequently modified so as to run concurrently with the sentence the defendant had left to serve on an earlier first-degree murder conviction the defendant had received for the shooting death of his wife. Such first-degree murder sentence had previously been commuted by the Governor and the defendant was on parole at the time of the incident involved here.

The defendant's defense to the charge of attempted first-degree murder, asserted for the first time in the district attorney's office at the charging conference and then reasserted in his testimony at trial, was that the gun accidentally discharged while he was struggling with Mary Bell in an effort to take it away from her. His claim was that the gun was discharged at close range during this struggle, wounding Mary Bell in the head.

The prosecution, through the testimony of Dr. Bressler, established that if the gun had been discharged at close range the victim would have suffered powder burns, but Mary Bell had none.

During his testimony, Dr. Bressler identified a series of photographs taken of the victim. He testified that Exhibits 8 and 10 were true and accurate representations of the way Mary Bell looked on February 17, 1975, some five weeks after the shooting. Exhibits 16 through 23 were true and accurate representations of the way the victim looked on April 21, 1975. The trial court ruled that all the photographs would be admitted into evidence, but that only Exhibits 9, 10, 16, 20, 21 and 22 would be shown to the jury. The trial court ruled that the

photographs were relevant to show the presence or absence of powder burns near the wound received by Mary Bell.

On this review the defendant contends the trial court should not have permitted the jury to view the photographs because the photographs were of such a nature as to evoke a sympathetic reaction toward the victim and hostility toward the defendant, the person accused of shooting her.

The admission of photographs into evidence is within the discretion of the trial court. In *Neuenfeldt v. State,* 29 Wis.2d 20, 32–33, 138 N.W.2d 252 (1965), this court stated:

"It is discretionary with the trial court to admit photographs to aid the jury in securing a clear idea of a material situation when the photographs better show that situation than does the testimony of witnesses. . . .

". . . 'where photographs are not substantially necessary or instructive to show material facts or conditions, and are of such a character as to arouse sympathy or indignation, or divert the minds of the jury to improper or irrelevant considerations, they should be excluded.' " *See also, State v. Wallace,* 59 Wis.2d 66, 86, 207 N.W.2d 855 (1973).

Similarly, and more recently, in *Hayzes v. State,* 64 Wis.2d 189, 218 N.W.2d 717 (1974), this court approved the admission of a series of photographs which depicted the position of a victim's body on the seat of an automobile and showed the trajectory of the bullet wound. In that case the court described the great latitude granted to trial courts regarding the admission of photographs:

"While reasonable persons looking at the photographs as a part of a record may have differing opinions in regard to whether they were cumulative, inflammatory, or

prejudicial, the judgment is essentially one to be exercised by the trial judge. He, better than anyone else, in light of the evidence, can make the determination that the photographs will assist the jury in a rational and dispassionate determination of the facts. Where a trial judge has applied the appropriate discretionary standards, this court will not reverse his decision unless it appears that, in light of the record as a whole, his conclusion was wholly unreasonable or if the circumstances indicate that the only purpose of the photographs was to inflame or prejudice the jury." *Id.* at p. 200.

In the instant case the trial court admitted the photographs because they showed the absence of powder burns on the victim. Dr. Bressler testified that if Mary Bell had suffered powder burns they would have been visible in the photographs unless the burns had been treated. He further testified that she had been given no treatment for any burns which would have erased them. It is apparent that the photographs, particularly Exhibits 16, 20, 21 and 24, which are rear or side views of Mary Bell's head, buttress the state's claim that she did not suffer powder burns and hence the conclusion that the gun was not fired at close range as claimed by the defendant.

The defendant on this review now contends that the existence or absence of powder burns was not an issue because all the testimony was very clear and conclusive that there were no powder burns. This position is contrary to the one taken by defense counsel at trial who, on cross-examination of Dr. Bressler, attempted to weaken his testimony about the absence of powder burns by obtaining an admission from the doctor that he was not specifically looking for powder burns when he treated the victim.

We conclude, under the circumstances of this case, that the trial court did not abuse its discretion in admitting

Exhibits 16, 20, 21 and 22. These photographs illustrated Dr. Bressler's testimony and were probative of the absence of powder burns.

■

Somewhat different considerations apply with respect to Exhibits 9 and 10, which are the photographs of the victim in a hospital setting taken approximately five weeks after the shooting. These two photographs are frontal views of Mary Bell and show her head swathed in bandages. These photographs do not show the wound or the potential powder burn area except at an obscure angle and as such served no purpose in aiding the jury in securing a clear idea of a material fact. As the state in its brief concedes, the photographs necessarily raised some feeling of sympathy for the victim. The trial court should not have permitted the jury to see Exhibits 9 and 10.

■

Although it was error for the jury to see Exhibits 9 and 10, we have examined the photographs and do not find that they were very inflammatory. In fact the testimony describing the wounds was much more gruesome than the photographs and their introduction may well have lessened the impact of that testimony. We conclude, applying either the test adopted in *Wold v. State,* 57 Wis.2d 344, 356, 204 N.W.2d 482 (1973), or the test suggested in *State v. Jennaro,* 76 Wis.2d 499, 509–510, 251 N.W.2d 800 (1977),[1] that the error was not prejudicial.

On direct examination by his attorney, the defendant testified his relationship with Mary Bell was "normal like anyone else, maybe a little argument now and then."

[1] *See also, Kelly v. State,* 75 Wis.2d 303, 249 N.W.2d 800 (1977), concurring opinion at 321–22, that under the circumstances of this case the admission of these two photographs was harmless error.

On cross-examination by the district attorney, the defendant, after denying that he had ever threatened Mary Bell's life, was asked, without objection, if he remembered an incident which had occurred at the Masterpiece Lounge four months before the shooting involving Mary Bell and a waiter. The defendant remembered the incident but denied that he, in a fit of anger and rage upon seeing Mary Bell and the waiter embrace, said to her, "I will kill you, Mary. I will kill both of you," and denied that he dragged her out of the place.

On rebuttal the prosecution called Yvonne Harper, the victim's niece, who testified about the Masterpiece Lounge incident. Ms. Harper stated that the defendant, upon seeing the waiter and Mary Bell embrace, responded in an angry rage by saying, " 'Hey stop . . . Don't nobody touch my woman . . . I'll kill you and I'll kill him, too. I'll kill both of you.' "

The defense then objected to Ms. Harper's testimony on the basis of remoteness and moved to strike it—claiming it had no probative value and was prejudicial. The trial court, citing sec. 904.04(2), Stats., permitting evidence of other crimes, wrongs, or acts when such evidence is offered as ". . . proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident"—denied the motion to strike, concluding the testimony went to the question of the defendant's intent. The court also agreed with the district attorney that such evidence was admissible as extrinsic evidence impeaching the defendant's denial that he had threatened Mary Bell in the Masterpiece Lounge.

On this review the defendant contends the trial court should have, applying the balancing test under sec. 904.03, Stats., excluded this evidence of the Masterpiece Lounge incident. Sec. 904.03 permits the exclusion of relevant evidence when the probative value of such evidence is substantially outweighed by the danger of unfair

prejudice, confusion of the issues or misleading the jury, or by undue delay, waste of time or needless presentation of cumulative evidence. The defendant contends evidence of the defendant's threats at the Masterpiece Lounge should have been excluded as being too remote in time to the shooting of Mary Bell and as being unfairly prejudicial to him, particularly in the absence of any showing of continued animosity toward her.

We conclude the defendant by failing to object to the evidence relating to the Masterpiece Lounge incident when it was first brought up on his cross-examination waived any right to later claim that the trial court improperly admitted such evidence.[2]

In *Holmes v. State,* 76 Wis.2d 259, 272, 251 N.W.2d 56 (1977), we recently stated:

"This court has repeatedly held that one of the rules of evidence is that an objection must be made as soon as the opponent might reasonably be aware of the objectionable nature of the testimony. *West v. State,* 74 Wis.2d 390, 401, 246 N.W.2d 675 (1976); *Coleman v. State,* 64 Wis.2d 124, 129, 218 N.W.2d 744 (1974); *Gedicks v. State,* 62 Wis.2d 74, 84, 214 N.W.2d 569 (1974); *Nadolinski v. State,* 46 Wis.2d 259, 267, 268, 174 N.W.2d 483 (1970); *Collier v. State,* 30 Wis.2d 101, 104, 140 N.W.2d 252 (1966). Failure to object results in a waiver of any contest to that evidence. *Mentek v. State,* 71 Wis.2d 799, 808, 238 N.W.2d 752 (1976); *Bennet v. State,* 54 Wis.2d 727, 735, 196 N.W.2d 704 (1972); *State v. Torpy,* 52 Wis.2d 101, 109, 110, 187 N.W.2d 858 (1971); *Nadolinski, supra,* 268."

The defendant's objection to the evidence is based on the claim that it is too remote. This objection should properly have been made at the first time the prosecu-

[2] *See Kwosek v. State,* 60 Wis.2d 276, 208 N.W.2d 308 (1973), and *also State v. Frizzell,* 64 Wis.2d 480, 219 N.W.2d 390 (1974).

tion brought up the Masterpiece Lounge incident even though it was during the district attorney's cross-examination of the defendant. If the Masterpiece Lounge incident was too remote to be brought out on rebuttal, it was also too remote to have been brought up on cross-examination. An objection should have been made immediately upon hearing the question raising the Masterpiece Lounge incident.

Furthermore, we conclude that even if a proper and timely objection had been made, the trial court did not abuse its discretion in admitting the evidence of the Masterpiece Lounge incident. This evidence was clearly relevant under the Wisconsin definition of relevancy which has been codified in sec. 904.01, Stats. That section provides:

"904.01 *Definition of 'relevant evidence.'* 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[3]

Here the evidence in question bears directly on one of the elements of the crime of attempted first-degree murder—intent. Additionally, the evidence was "of consequence" to the determination of the action insofar as it went to negate the defendant's claim of accident. The evidence was properly admitted as evidence of other crimes, wrongs or acts under sec. 904.04(2), Stats.[4]

Moreover, we conclude the probative value of such evidence clearly outweighed any unfair prejudicial impact such evidence might have had on the defendant and

---

[3] *See also Holmes v. State, supra,* 76 Wis.2d at 267–68.

[4] *State v. Spraggin,* 77 Wis.2d 89, 252 N.W.2d 94 (1977).

thus the trial court properly refused to exclude such evidence. Sec. 904.03, Stats. We note that the testimony of the Masterpiece Lounge incident was not evidence of the defendant's involvement in another *criminal* act. Such evidence simply established that the defendant made a threat to the victim four months before the shooting.

While evidence of other crimes, wrongs or acts under sec. 904.04(2), Stats., is not limited to any actual other *criminal* acts,[5] it is clear that evidence of other *criminal* acts would generally have more potential for unfair prejudice by showing bad character than would evidence such as was admitted here showing simply the defendant's prior act of threatening the victim.

In fact, it is generally recognized that threats by an accused against the victim are competent admissible evidence in homicide prosecutions. *See* 40 Am. Jur.2d, *Homicide,* pp. 586–87, sec. 316, wherein it is stated:

"Such previous threats by the accused to kill the deceased tend to show the state of the accused's mind, his intent to kill, and his malice against the deceased at the time of the homicide. Former threats made by the accused against the deceased are also admissible as evidence upon the question whether the accused in fact committed the homicide, because they show an intention on his part to do it and, therefore, a probability that he is the person who did it. . . .

"Mere remoteness, from the time of the killing, of threats made by the defendant which were directed at the deceased does not affect their admissibility as evidence against the accused; remoteness in point of time prior to the homicide goes merely to the weight and not to the competency of the threats as evidence." *See also* 40 C.J.S., *Homicide,* pp. 1167–68, sec. 236.[6]

---

[5] *See State v. Reynolds,* 28 Wis.2d 350, 137 N.W.2d 14 (1965).

[6] *See Kasieta v. State,* 62 Wis.2d 564, 215 N.W.2d 412 (1974); *Benedict v. State,* 14 Wis. 459 (*423) (1861).

So, too, in the instant case, the evidence of the defendant's prior threats was probative of the defendant's intent and was probative to negate his claim of an accidental shooting.

Although, as we noted in *Whitty v. State*, 34 Wis.2d 278, 149 N.W.2d 557 (1967), cert. denied, 390 U.S. 959 (1968), the admissibility of prior acts, wrongs, or crimes depends in part on the nearness of time, place and circumstances, we do not view the events occurring at the Masterpiece Lounge four months prior to the shooting as being so remote as to render such evidence irrelevant. The four-month lapse between the threats and the shooting was not so great as to "negative all rational or logical connection" between the two. The trial court did not abuse its discretion in refusing to exclude the evidence on the basis of remoteness.[7]

Similarly, we conclude the defendant's other argument that the trial court abused its discretion by permitting the prosecution to present Yvonne Harper's testimony in rebuttal rather than in its case-in-chief is without merit.

The standard governing rebuttal evidence was set forth in *Rausch v. Buisse*, 33 Wis.2d at 167:

"The general rule is that the plaintiff, in his rebuttal, may only meet the new facts put in by the defendant in his case in reply. This rule is not inflexible and the court may in its discretion allow or refuse to receive such evidence. An exception is generally made when the evidence is necessary to achieve justice."

In *State v. Watson*, 46 Wis.2d 492, 499–500, 175 N.W. 2d 244 (1970), this court elaborated on the considerable

---

[7] *Rausch v. Buisse*, 33 Wis.2d 154, 166, 146 N.W.2d 801 (1966); *Hough v. State*, 70 Wis.2d 807, 235 N.W.2d 534 (1975); *State v. Lombardi*, 8 Wis.2d 421, 99 N.W.2d 829 (1959).

discretion possessed by a trial court over the admission of evidence on rebuttal:

" 'The determination of what is admissible on rebuttal is primarily for the discretion of the trial court. The court may even admit in rebuttal evidence which should have been introduced upon the examination in chief, provided the adverse party is allowed to reply thereto. The appellate court will not reverse the action of the trial court in admitting rebuttal evidence, in the absence of a clear abuse of discretion.' "[8]

In the instant case the evidence of prior threats at the Masterpiece Lounge was introduced to show intent and absence of mistake or accident. This court's prior decisions in *King v. State*, 75 Wis.2d at 42–46; *Ameen v. State*, 51 Wis.2d 175, 186 N.W.2d 206 (1971) ; *Parham v. State*, 53 Wis.2d 458, 192 N.W.2d 838 (1972), and *Hough v. State*, 70 Wis.2d 807, 235 N.W.2d 534 (1975), make it clear that the state is not limited to producing evidence of prior conduct relevant to intent in its case-in-chief.

McCormick in his treatise on *Evidence* notes that when the crime charged involves the element of knowledge or intent, such as is present in the instant case, courts generally more readily permit the prosecution to show other crimes or acts of the accused in rebuttal after the issue has been sharpened by the defendant's evidence of accident or mistake. McCormick, *Evidence*, p. 452, sec. 190 (2d ed. 1972).

In this case the defendant's assertion in his testimony that the shooting was accidental, that his relationship with Mary Bell was normal, and that it was the victim who precipitated the struggle over the shotgun, made the evidence of the Masterpiece Lounge incident properly admissible in the state's rebuttal. The evidence was

[8] *See also King v. State*, 75 Wis.2d 26, 42–46, 248 N.W.2d 458 (1977).

not only admissible to show intent and absence of mistake or accident but was also admissible to impeach the defendant's testimony including his specific denial of ever threatening to kill Mary Bell.

Because we conclude the state could properly present this testimony in rebuttal, we reject the defendant's argument made for the first time on this appeal that the introduction of such evidence in rebuttal rather than the state's case-in-chief denied him due process of law.

We have reviewed the record in this case and applying the often repeated tests for sufficiency of the evidence, see *Bautista v. State*, 53 Wis.2d 218, 191 N.W.2d 725 (1971), we conclude the jury, acting reasonably, could be convinced by the evidence it had a right to believe and accept as true of the defendant's guilt beyond a reasonable doubt.

In *State v. Schenk*, 53 Wis.2d 327, 332, 193 N.W.2d 26 (1972), this court stated:

"In order to sustain a conviction for attempted murder, two elements must be established: (1) A specific intent to take the life of another human being; and (2) an unequivocal act which, except for the intervention of some extraneous factor, would have resulted in the death of that individual."

In this case those requirements are satisfied by the circumstantial evidence presented by the state from which the jury could reasonably infer that the defendant shot Mary Bell when the muzzle of the gun was at least four feet from her head. Because the accused is presumed to have intended the natural and probable consequences of his voluntarily and knowingly performed

acts,[9] the jury could properly find the requisite intent was present in this case along with the unequivocal act of shooting the victim in the head with a shotgun. The evidence is sufficient.

We are unable to conclude that the defendant probably should not have been found guilty and that justice therefore demands that he be given another trial. Therefore the defendant's request for a new trial in the interest of justice, pursuant to sec. 251.09, Stats., is denied.

*By the Court.*—Judgment and order affirmed.

---

[9] *See Hawpetoss v. State,* 52 Wis.2d 71, 187 N.W.2d 823 (1971); *Gelhaar v. State,* 41 Wis.2d 230, 163 N.W.2d 609 (1969), cert. den. 399 U.S. 929.