STATE, Plaintiff in error, v. FLYNN, Defendant in error.†

Supreme Court

No. 77–078–CR. Argued October 9, 1979.—Decided December 4, 1979.

(Also reported in 285 N.W.2d 710.)

† Motion for reconsideration denied, without costs, on January 15, 1980.

For the plaintiff in error there were briefs by *Bronson C. La Follette,* attorney general, and *Wm. L. Gansner,* assistant attorney general, with oral argument by *Chris Heikenen,* assistant attorney general.

For the defendant in error the cause was argued by *Richard M. Sals,* assistant state public defender, with whom on the brief was *Howard B. Eisenberg,* state public defender.

BEILFUSS, C. J.   The facts out of which this question arises are as follows: On February 5, 1976, at approximately 2:45 a.m., Green Bay Police Officer Timo-

thy Sargent was dispatched to a break-in at Trader's Point, a sporting goods store in the 200 block of North Broadway, Green Bay, Wisconsin. A witness had reportedly observed a man between 5'9" and 6' tall with dark hair and dressed all in dark clothing break a window to the store and remove a rifle. Upon his arrival at the scene, Officer Sargent was instructed to patrol the area and look for possible suspects.

At approximately 3:15 a.m., Sargent observed two men emerge from an alley one-and-a-half to two blocks away from Trader's Point. One of the men fit the description of the man who had been seen breaking into the store a half hour earlier. After notifying headquarters that "he had a suspect and that there was another party with him," Officer Sargent approached the two men and requested identification.

The person who fit the suspect's description identified himself as Daniel Liesch. The other person, however, who was later identified as Robert Flynn, defendant herein, refused to identify himself. Officer Sargent explained to the defendant his reason for requesting identification—that there had been a burglary in the area and that he was in the company of a man who fit the burglar's description—but Flynn persisted in his refusal. Flynn admitted that he was carrying identification in his wallet but stated that under no circumstances would he show it to Officer Sargent. Sargent then informed Flynn that if he did not identify himself he would be taken down to the police station and properly identified there. Again Flynn refused, becoming verbally abusive as he did so.

At this point Officer Sargent instructed Flynn to spread his legs and raise his hands so that he could frisk him. Two other police officers, Officer Timmerman and Sergeant Grimmett, had also arrived on the scene by this time. In the course of the frisk, Officer Sargent re-

moved Flynn's wallet and a long-nosed pliers from his left pocket. As he did so, Flynn suddenly dropped his arms and a flashlight fell from his sleeve into the ground. The pliers and the flashlight were seized.

Officer Sargent handed the wallet to Sergeant Grimmett immediately after removing it from Flynn's pocket. Grimmett opened the wallet and leafed through it until he found something with Flynn's name on it. Upon discovering his identity, the officers radioed headquarters and were informed that a "pick-up" order had been issued on him. Flynn was then placed under arrest and conveyed to the police station. Liesch was not arrested but was allowed to ride to the station with Flynn at his own request.

At approximately six or seven a.m., the following morning, it was discovered that the King's X Bar, located in the same general area, had also been broken into. A long-nosed pliers and a flashlight were among the items that had been taken in that burglary. At 9:15 a.m., after having been confronted with this information, Flynn signed a written statement admitting that he and Daniel Liesch had broken into the King's X Bar between 2:30 and 2:45 a.m., on February 5, 1976, and had taken a box of steaks and a bottle of wine in addition to the flashlight and pliers. The steaks and wine were later recovered by police in an alley where Flynn told them he had left them.

Flynn also admitted at this time that on January 31, 1976, he had attempted to steal a stereo from a Prange-Way Store located in Green Bay. It was this offense that had been the subject of the "pick-up" order issued on him. According to Corporal Huth of the Green Bay Police Department, who had issued the order, Flynn had been identified by several witnesses to that offense. When Flynn had failed to appear for questioning as previously arranged, Huth issued the "pick-up" order.

Flynn was charged with the burglary of the King's X Bar by a criminal complaint filed February 5, 1976. On April 20, 1976, he filed a motion to suppress all oral and physical evidence on the ground that it had been obtained in an illegal search. Following a hearing on this motion the county court filed a written decision granting defendant's motion in all respects. The court ruled that Officer Sargent had no grounds for conducting any type of a search of defendant. It made no formal findings of fact but merely stated in its decision that the search was clearly illegal because "there is no evidence that the officer had any fear for his safety or was conducting a patdown for weapons."

We believe that the trial court erred in its ruling that Officer Sargent was not justified in conducting at least a *Terry*-type stop-and-frisk of the defendant. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams,* 407 U.S. 143, 145 (1972). In *Terry v. Ohio,* 392 U.S. 1 (1967), the United States Supreme Court held that where a police officer lacks probable cause to arrest an individual but has reason to believe that such individual may be involved in the commission of a crime, he may stop such person for questioning. If there is also reason to believe that the individual stopped may be armed, the officer may conduct a limited pat-down search for weapons of the person's outer clothing.

The court emphasized in *Terry* that the test to be used in determining whether a police officer's intrusion was justified is an objective one.

". . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable

facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making such assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" 392 U.S. at 21–22.

Applying this test to the case before us, we believe that Officer Sargent was aware of sufficient facts to warrant a brief investigatory stop of the defendant on the morning of February 5, 1976. A burglary had been reported in the immediate vicinity only a half hour earlier. It was in the early morning hours and there was no one else on the streets. Defendant was in the company of a person who fit the description of the man seen breaking into the store, and the two had just emerged from an alley. Under these circumstances "[i]t would have been poor police work indeed for an officer . . . to have failed to investigate this behavior further." *Terry v. Ohio*, 392 U.S. at 23.

We also believe that Officer Sargent had sufficient justification under *Terry* to frisk both Liesch and the defendant for weapons before questioning them. "It is clearly the law that a police officer 'making a reasonable investigatory stop' is not to be denied such 'opportunity to protect himself from attack by a hostile suspect.' " *State v. Williamson*, 58 Wis.2d 514, 519–20, 206 N.W.2d 613 (1973). "Police officers are not required to take unnecessary risks in the performance of their increas-

ingly hazardous duties." *State v. Beaty,* 57 Wis.2d 531, 539, 205 N.W.2d 11 (1973).

This court has upheld the right of a police officer to frisk suspects for weapons in cases involving drug and even traffic offenses, as well as those in which the nature of the offense would seem to indicate a much greater likelihood that the suspect is armed. *State v. Chambers,* 55 Wis.2d 289, 198 N.W.2d 377 (1972) ; *State v. Williamson,* supra. It is not simply the nature of the suspected offense but all of the circumstances under which the confrontation takes place that must be taken into consideration in determining whether an officer is entitled to conduct a limited weapons search of a person whom he has justifiably stopped.

In the case before us, Officer Sargent was aware that a burglary had occurred in the area and that at least one firearm had been taken. Even had a gun not been reported taken in the break-in, Officer Sargent would have been justified in frisking defendant and his companion for weapons. A burglary is certainly the type of offense that would " 'warrant a man of reasonable caution in the belief' " that the one who committed the offense may be armed. And when a police officer confronts one suspected of such a crime in a desolate alley in the early morning hours, and the suspect becomes verbally abusive and uncooperative at the mere request for identification, the officer's right to frisk for weapons is obvious.

It does not follow from the fact that only one person was seen breaking into Trader's Point and that the defendant himself did not fit the description of that person that Officer Sargent was not justified in stopping and frisking defendant as well as Liesch. Faced with a simi-

lar situation in *United States v. Berryhill,* (9th Cir. 1971), 445 F.2d 1189, 1193, the Ninth Circuit stated:

> "It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed."

In the case before us, defendant was not simply a companion of the suspect who happened to be present sometime after the offense for which the investigatory stop was made. The burglary had occurred only a half-hour earlier. Although only one person had been seen breaking into the store, this certainly did not preclude the possibility of an accomplice. The fact that defendant was in the company of a suspect so soon after, and in the immediate vicinity of, the offense was all the more reason for Officer Sargent to subject him, as well as Liesch, to a protective search for weapons. Moreover, in view of the fact that defendant was being uncooperative and acting suspiciously, Officer Sargent was clearly justified in taking such precautions.

The facts we have relied upon in reaching this conclusion are in no way inconsistent with any factual findings by the trial court. The trial court, however, based its conclusion upon its finding that "there is no evidence that the officer had any fear for his safety or was conducting a patdown for weapons." We believe this finding to be totally unsupported in the record before us and therefore do not accept it.

"On review of an order suppressing evidence, the findings of fact, if any, of the trial court will be sustained unless against the great weight and clear preponderance of the evidence." *Bies v. State,* 76 Wis.2d 457, 469, 251 N.W.2d 461 (1977). Any conflicts in testimony will be resolved in favor of the trial court's finding. *State v. Verhasselt,* 83 Wis.2d 647, 653, 266 N.W.2d 342 (1978). The credibility of police officers and others testifying at a suppression hearing outside the presence of the jury is a question for determination by the trial court. *State v. Pires,* 55 Wis.2d 597, 602–03, 201 N.W.2d 153 (1972).

We acknowledge the deference the trial court's factual finding is entitled to under these rules; however, we are unable to accept that finding in view of the record before us. While it is true that Officer Sargent clearly intended to discover defendant's identity in removing his wallet, it does not follow that this was the only reason for the frisk. If it was, then there would have been no reason to frisk Liesch who had already identified himself.

Officer Sargent testified at the suppression hearing that he did not just remove defendant's wallet, but completely frisked him. He stated that it was normal policy to frisk a suspect "for the safety of the Officer, and any other individual that he may be coming in contact with." On cross-examination he later testified that he frisked defendant because he was fearful for his safety. Asked why he was fearful, Officer Sargent replied:

"The fact that the party was refusing to cooperate. That there was the incident at Trader's Point, and at that time they were not sure if only the rifle had been taken; that there may have been other articles or weapons taken. And it was just that I am very leery of anyone that I stop. I take precautions to protect myself."

There was no other testimony as to the intent of Officer Sargent in frisking the defendant. Obviously, only

the officer himself could say what was on his mind at the time he performed the search. Because intent can often be inferred from one's actions, however, we must also review Officer Sargent's conduct to determine if the absence of fear or suspicion found by the trial court was so demonstrated here. We find that it was not.

Removing defendant's wallet clearly shows an intent to discover his identity, not a fear of his being armed. But that is not all that Officer Sargent did. He stated that he frisked defendant by patting his pockets and removing the articles that could be used as weapons. These actions demonstrate a suspicion that defendant was armed and the officer's direct testimony that he feared defendant was armed further supports this conclusion. It may be that the trial court totally disbelieved the officer's testimony, but this does not appear from its decision. The court did not state that it found Officer Sargent's testimony incredible, but rather that there was no evidence that the officer feared for his safety. It is this conclusion that we find contrary to the great weight and clear preponderance of the evidence.

Turning now to the actual search conducted by Officer Sargent, we believe that his initial discovery and removal of the pliers and flashlight from defendant's person was entirely proper under the United States Supreme Court's holding in *Terry v. Ohio,* 392 U.S. 1 (1967), and under this state's statutory expression of that holding.[1] Offi-

[1] "968.25 **Search during temporary questioning.** When a law enforcement officer has stopped a person for temporary questioning pursuant to s. 968.24 and reasonably suspects that he or another is in danger of physical injury, he may search such person for weapons or any instrument or article or substance readily capable of causing physical injury and of a sort not ordinarily carried in public places by law abiding persons. If he finds such a weapon or instrument, or any other property possession of which

cer Sargent tesitfied that he removed the pliers, along with the wallet, from defendant's pants pocket while frisking him. On cross-examination he testified that he patted down the defendant's outer clothing and, other than the wallet, removed only those articles that could be used as weapons. Articles that were not susceptible to such use were left in the pockets. The removal of the long-nosed pliers pursuant to this procedure was proper. A pliers is generally a hard metal object that could serve as a weapon. At the very least, the officer was justified in removing the object from defendant's pocket so as to determine what it was.

The State's case with respect to the flashlight is even stronger. Officer Sargent testified that, while he was conducting the frisk, defendant suddenly dropped his arms and the flashlight fell out of his sleeve onto the ground. At the suppression hearing defendant himself denied that the flashlight had fallen from his sleeve or that it was even his. He stated that it was already lying on the ground when he arrived at the spot where Officer Sargent stopped him. Under either version it is clear that Officer Sargent observed the flashlight in plain view on the ground in a public street while he was conducting a lawful frisk. It follows that his discovery of the flashlight was not illegal.

Having thus far concluded that Officer Sargent was constitutionally justified in subjecting the defendant to an investigatory stop-and-frisk, and that the officer lawfully discovered the pliers and flashlight in the course of this frisk, we now reach the dispositive issue in the case before us: Whether the officers were similarly justified

he reasonably believes may constitute the commission of a crime, or which may constitute a threat to his safety, he may take it and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest the person so questioned."

in removing defendant's wallet from his pants pocket and searching it in order to determine his identity.

We view this issue as dispositive for several reasons. First, unless we are able to find that the officers discovered defendant's identity in a constitutionally permissible manner, it necessarily follows that the arrest of defendant was illegal. For although we believe that the police had probable cause to arrest Robert Flynn for the attempted theft of a stereo at the Prange-Way Store, until they removed and searched his wallet the officers had no reason to believe that the person then standing before them was Robert Flynn. If the search was illegal, it clearly follows that the arrest based upon the information obtained in that search was likewise illegal. *State ex rel. Furlong v. Waukesha County Court,* 47 Wis.2d 515, 524, 177 N.W.2d 333 (1970).

Furthermore, if defendant's identity was discovered in the course of an illegal search, not only was his arrest illegal, but serious questions also arise under the *Wong Sun* doctrine as to the admissibility into evidence of both the pliers and the flashlight, as well as defendant's confession. This is because, although the pliers and flashlight were lawfully discovered in the course of the frisk, it was not until sometime after defendant's arrest that the connection between those articles and the criminal activity became known. Without probable cause to believe that such a connection did exist, or without lawful grounds to arrest defendant, the police had no legal right to maintain possession of these articles as they did. *Myers v. State,* 60 Wis.2d 248, 261, 208 N.W.2d 311 (1973).

Similarly with respect to the confession, unless defendant's arrest was lawful, a difficult question arises as to whether the connection between the arrest and the incriminating statements obtained from him during his detention was sufficiently attenuated to permit the use

of those statements at trial. *Wong Sun v. United States,* 371 U.S. 471 (1963). If the confession was "obtained by exploitation of the illegality of his arrest," it must be excluded. *Brown v. Illinois,* 422 U.S. 590, 600 (1975); *Dunaway v. New York,* 442 U. S. 200 (1979).

We now turn, therefore, to the question of whether the search of defendant's wallet under the facts of this case violated his Fourth Amendment right to be free from unreasonable government intrusion.

The concurring opinions to *Terry v. Ohio, supra,* by Justices HARLAN and WHITE, and the later majority opinions of the United States Supreme Court on this issue, held that a police officer may, under certain circumstances, frisk an individual for weapons upon less than probable cause, and further held that an officer may initially stop an individual suspected of criminal involvement under those same circumstances. Thus, as that court later stated in *Adams v. Williams, supra:*

". . . Terry recognizes that it may be the essence of good police work to adopt an intermediate response. See *id.,* at 23. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." 407 U.S. at 145–46.

Such an intermediate response is expressly allowed by sec. 968.24 of our own Wisconsin statutes:

"968.24 **Temporary questioning without arrest.** After having identified himself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of his conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped."

It is important to note that neither *Adams* nor sec. 968.24, Stats., limits the authority of a police officer acting with reasonable suspicion to simply stopping the suspected individual temporarily. In *Adams,* the court stated that an officer may stop a person under such circumstances "in order to determine his identity," and sec. 968.24 provides that the officer "may demand the name and address of the person."

Indeed, unless the officer is entitled to at least ascertain the identity of the suspect, the right to stop him can serve no useful purpose at all. The suspect need only wait for what may be presumed to be a reasonable time, and then proceed on his way. Ignorant of even the person's name, the officer must either attempt to follow the suspect in the hope that he will discover some clue as to his identity, or surrender the potential lead and continue his investigation along other lines. Particularly where the officer is confronted with a number of potential suspects, limiting his options in this manner could have a perplexing effect on law enforcement efforts.[2]

Defendant argues, however, that although a police officer may stop a suspect on less than probable cause and request indentification, the individual stopped is under no obligation to provide it. And if he does not provide identification, defendant continues, the officer has no right to remove and search his wallet in order to obtain

---

[2] We are not unmindful of the fact that in actual practice, "very few suspects stopped for field interrogation refuse to respond." La Fave, *"Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond,* 67 Mich. L. Rev. 39, 108 (1968). There is no guarantee, however, that such a public willingness to cooperate will continue undiminished in the future. More important, still, is the fact that it is just those persons that refuse to cooperate under such circumstances whose identities the police should know. This is not to say that no innocent person would refuse to identify himself, but where the request is made for valid reasons which are explained to the suspect, the refusal itself must be considered suspect.

it. As support for his argument, defendant relies heavily upon the following language contained in *Terry v. Ohio, supra:*

"The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." 392 U.S. at 29.

We are not convinced by this quotation that the search of defendant's wallet under the facts now before us was illegal. It is clear from the language itself that the court's holding in *Terry* was limited to the precise situation before it. The court did not say that the sole justification for any search on less than probable cause is the protection of the police officer and others, but that that was the sole justification of the search in the situation then before it. The situation before us is significantly different.

That the United States Supreme Court did not intend in *Terry* to limit the authority of law enforcement officers to conduct searches without probable cause solely to situations where they fear a suspect may be armed is also clear from other decisions by that court. *See United States v. Ramsey,* 431 U.S. 606, 619 (1977), in which the court reaffirmed the longstanding rule that indiscriminate border searches of persons and their possessions entering the country are *per se* reasonable, and *Bell v. Wolfish,* 441 U.S. 520 (1979), in which regularly conducted room and body cavity searches were held not to violate Fourth Amendment rights of pretrial detainees of a prison facility.

Almost the exact same question before us here was expressly reserved by the United States Supreme Court in the recent case of *Brown v. Texas,* 99 Sup. Ct. 2637, 2641 (1979). At issue in that case was a Texas statute which made the intentional refusal to identify oneself

to a peace officer who lawfully stopped him and requested the information a criminal offense. The court held that the stop made in that case was not based upon reasonable suspicion and refused to reach the question of whether the statute itself was valid. Chief Justice BURGER stated in a footnote to the opinion, "We need not decide whether an individual may be punished for refusing to identify himself in the context of a lawful investigatory stop which satisfies Fourth Amendment requirements." 99 Sup. Ct. at 2641. *See also Michigan v. DeFillippo*, 99 Sup. Ct. 2627 (1979), involving a similar statute.

In the case now before us the question is not whether a person can be punished for his refusal to identify himself, but whether, if he does so refuse under circumstances in which an officer is justified in stopping him and requesting identification, may the officer remove his wallet and obtain the identification against his will? Certainly the intrusion at issue here is less serious than that made possible under the Texas and Michigan laws on which the Supreme Court withheld judgment. We therefore believe the question before us to be an open one.

To accept defendant's contention that the officer can stop the suspect and request identification, but that the suspect can turn right around and refuse to provide it, would reduce the authority of the officer granted by sec. 968.24, Stats., and recognized by the United States Supreme Court in *Adams v. Williams*, 407 U.S. 143 (1972), to identify a person lawfully stopped by him to a mere fiction. Unless the officer is given some recourse in the event his request for identification is refused, he will be forced to rely either upon the good will of the person he suspects or upon his own ability to simply bluff that person into thinking that he actually does have some recourse. In our view neither of these alternatives is satisfactory, nor is either called for under the Fourth Amendment.

As we noted in our recent decision in *Bies v. State,* 76 Wis.2d 457, 251 N.W.2d 461 (1977), the determination of whether particular police investigatory conduct passes constitutional muster is not an all-or-nothing proposition. The mere fact that the officer "lacks the precise level of information necessary for probable cause to [search]," does not necessarily and in every case render his search invalid.

"The ultimate standard under the Fourth Amendment is the reasonableness of the search or seizure in light of the facts and circumstances of the case. *State v. Elam,* 68 Wis.2d 614, 621, 229 N.W.2d 664 (1975); *Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S. Ct. 2523, 37 L. Ed.2d 706 (1973). The determination whether police conduct is constitutionally reasonable in a given case must be made by application of 'what is essentially an indeterminate and flexible test.' *Browne v. State, supra,* 24 Wis.2d at 507." 76 Wis.2d at 468.

The United States Supreme Court also recently stated:

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. at 559.[3]

---

[3] This balancing-type approach to Fourth Amendment questions was also approved by the United States Supreme Court in another recent case:

"Thus, the permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse,* 99 Sup. Ct. 1391, 1396 (1979).

In fact, *Terry* itself rejects the all-or-nothing approach argued for by defendant. *See* 392 U.S. at 17.

Applying these considerations to the police conduct in question here, we believe that Officer Sargent acted reasonably in removing defendant's wallet so as to ascertain his identity. In balancing the need for the particular search against the invasion of personal rights that it entailed, we first note that Officer Sargent was, during the early morning hours, in the process of investigating a burglary that had occurred in the immediate vicinity less than an hour earlier. At the time the officer encountered the defendant he was aware that at least one firearm had been taken in that burglary. The public interest in the quick apprehension of burglars is compelling by itself, but when the object of the successful burglary is firearms, that interest becomes especially urgent.

Furthermore, as we indicated above, an officer confronted with a situation in which he has a reasonable suspicion that a certain individual is involved in criminal activity, but lacks that degree of evidence necessary to effect a lawful arrest, has great need of at least obtaining the individual's name if he is to be able to adequately perform his duty and conduct a proper investigation. Unless informed of the suspect's identity, he must forego either the possible lead itself or the rest of his investigation. Thus, it must be admitted that the state's need for the particular intrusion is clearly substantial.

On the other side of the scale is the magnitude of the invasion upon defendant's personal rights. No intrusion into an individual's personal and private effects is considered by us to be minor. The right of a person to be free of unreasonable government searches is certainly one of the most cherished freedoms guaranteed by both the state and federal constitutions.

" 'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own per-

son, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' " *Terry v. Ohio,* 392 U.S. at 9, quoting from *Union Pacific R. Co. v. Botsford,* 141 U.S. 250, 251 (1891).

In spite of the gravity with which we view any intrusion upon an individual's personal rights, however, we are unable to say that under the facts of this case the officer's conduct was unreasonable. Officer Sargent did not arbitrarily seize the defendant as he was walking down the street, reach into his pocket, remove his wallet, and then go leafing through it looking for evidence that could be used against him. Rather, the officer first approached the defendant and his companion as they emerged onto the street from an alley in the immediate vicinity of a store that had been burglarized hardly a half-hour earlier. The time of day was such that virtually no one else was on the streets and defendant's companion matched the description of the man who had been seen breaking into the store and removing a rifle such a short time ago. Certainly, as we concluded above, Officer Sargent had ample grounds to suspect defendant's involvement in the earlier burglary.

Even though he held such a suspicion, however, the officer did not, on that basis alone, remove and search defendant's wallet. He first requested that defendant and his companion identify themselves. Defendant's companion did in fact identify himself and, as far as the record shows, nothing more was said. Defendant, on the other hand, not only refused to identify himself but became increasingly belligerent as he did so. Using obscenities, he told the officer he does not present identification to any officer who stops him. Even after the officer explained to the defendant his reasons for requesting identification, defendant persisted in his refusal. Finally, convinced that defendant would not willingly divulge his identity, Officer Sargent removed his wallet and handed it to Sergeant Grimmett who then opened it

and took the name down from one of the papers contained therein. The wallet was then returned to the defendant.

We believe the officer's conduct was justified. This is not the case of a police officer acting in bad faith or seeking to harass another person. These officers were not fishing for whatever evidence they could find, but sought merely to learn defendant's identity. We believe that under the circumstances of this case they had a right to know his identity.

Furthermore, the actual intrusion upon defendant's privacy was "as limited as [was] reasonably possible consistent with the purpose justifying it in the first instance." *Bies v. State,* 76 Wis.2d at 469. Officer Sargent did not completely search the defendant. Other than the wallet, the only other articles taken from defendant were those that were susceptible to use as weapons. The wallet was searched only for identification after defendant had openly admitted that it contained identification. Thus, the scope of the search was no broader than was necessary to obtain the information, the need for which justified the intrusion in the first place.

Perhaps most significant is the fact that defendant could himself have substantially avoided the intrusion simply by producing the identification himself as his companion did. The officers then would have had no reason to reach into his pocket, remove the wallet and search it for identification. It was his unreasonable refusal to do so that led to the police conduct of which he now complains. In light of that refusal, and under the circumstances that then existed, we believe that the police action in question was justified.

We strongly emphasize, however, that in deciding this case as we do, we by no means intend to sanction or condone, in any way, abusive, overbearing, or harassing police conduct. Our holding today that the officer was justified in removing and opening defendant's wallet in

order to ascertain his identity is limited to factual situations such as the one presently before us. Under these circumstances we believe a police officer may conduct a limited search of a suspect's wallet for the sole purpose of discovering the person's identity.

Because the officer's discovery of defendant's identity was not in violation of his Fourth Amendment rights, it follows that his arrest for the attempted theft at the Prange-Way Store was lawful. The police did have probable cause to believe that defendant had committed this offense because he had been identified by several eyewitnesses. Furthermore, because the crime alleged was a felony, no warrant was required in order to effect the arrest. *West v. State*, 74 Wis.2d 390, 398, 246 N.W.2d 675 (1976); *Pillsbury v. State*, 31 Wis.2d 87, 91, 142 N.W.2d 187 (1966); sec. 968.07 (1) (d), Stats.

The arrest being legal, it also follows that the evidence obtained as a result of that arrest, *i.e.*, the pliers, flashlight and confession, were admissible into evidence and should not have been excluded. We therefore reverse the order of the trial court suppressing that evidence and remand the case for further proceedings not inconsistent with this opinion.

*By the Court.*—Order reversed and cause remanded for further proceedings not inconsistent with this opinion.

The following memorandum was filed February 7, 1980.

*(On motion for reconsideration).* The public defender, in his memorandum in support of the motion for reconsideration, contends that the court overlooked the recent United States Supreme Court decision in *Ybarra v. Illinois,* — U.S. — 62 L. Ed.2d 238 (1979), as it does not appear in our opinion and that the decision is dispositive in the present case. While the *Ybarra v. Illinois, supra,* decision was not cited or referred to in our opinion, it was not an oversight, but rather we found that case to be factually distinguishable.