STATE of Wisconsin, Plaintiff-Respondent,

. V.

Lawrence KRAMER, Defendant-Appellant-Petitioner.†

Supreme Court

*No. 78–833–CR. Argued October 28, 1980.—*
*Decided November 25, 1980.*

(Also reported in 298 N.W.2d 568.)

† Motion for reconsideration denied, without costs, on January 13, 1981.

For the petitioner the cause was argued by *William Tyroler*, assistant state public defender, with whom on the briefs was *Richard J. Johnson*, assistant state public defender.

For the respondent the cause was argued by *David J. Becker*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

COFFEY, J. This is a review of a decision of the court of appeals[1] affirming a judgment of the circuit court for Racine county, JAMES WILBERSHIDE, Circuit Judge, convicting Lawrence Kraimer (defendant) of manslaughter, contrary to sec. 940.05(1), Stats. Prior to trial, the circuit court denied a motion by the defendant to exclude all of the evidence against him in this case on the ground that it was the product of an illegal war-

---

[1] The decision of the court of appeals is reported at 91 Wis.2d 418, 283 N.W.2d 438 (Ct. App. 1979).

rantless entry and a violation of his *Miranda* rights. The denial of the defendant's suppression motion forms the basis of this appeal.

The first witness called at the suppression hearing was Racine Police Lt. Daniel Elmer who testified that on the morning of Monday, May 15, 1978, he received three anonymous telephone calls at the Racine Police Department at 8:25 a.m., 9:00 a.m. and 9:20 a.m. Elmer later identified Kraimer's voice as that of the caller.[2] During the course of these phone conversations, the defendant told Elmer that he had shot and believed he had killed his wife four days earlier; that his wife's body was in an upstairs bedroom near a bathroom and that he had his four children at home with him, who ranged in age from a 12-year old male to a two-year old female. Elmer testified that the defendant stated that he was very upset and wanted to get the matter resolved as he could not live in a house with his wife lying dead upstairs. Thereupon, Lt. Elmer arranged to meet Kraimer at a downtown restaurant, but Kraimer failed to appear.

Although Kraimer failed to show at the prearranged meeting place, Elmer, impressed with the sincerity of the caller, referred the matter to the Detective Bureau for immediate inquiry because of the possibility that a crime had been committed and the risk of danger presented to the children by the caller's emotional state. With the information gained from the phone conversations, the Detective Bureau contacted 12 local grade schools and requested the names of all of their absent 12-year old male students with three younger siblings in the family, two of whom might also be of school age, but absent from school that day. This investigation by

---

[2] The calls were received on a "Helpline" maintained by the Racine Police Department for the purpose of allowing citizens to report crimes while remaining nameless, if so desired. The defendant knew that he was contacting the police department and speaking with a police officer when he made the Helpline calls.

the Racine Police Department revealed that the Kraimer family was one of three families with three school age children absent that date. The police checked out the other two residences and finding nothing suspicious centered their investigation on the Kraimer home.

Detective Gerald Frievault, after being informed that there may have been a homicide at the Kraimer residence, was dispatched to check out the welfare of the defendant's children and to determine if there was any connection between the anonymous phone calls and the Kraimer home. He arrived at the defendant's residence between 1:00 and 1:30 p.m., and knocked on the front door but received no response. He then attempted to inquire of the neighbors on either side of the defendant's house, but was unable to find anyone at home. Frievault returned to the Kraimer residence and upon further investigation, observed that a windowpane was missing from the back door. Although there was no sign of broken glass on the floor inside the house, Frievault became suspicious and believed that the broken pane indicated a possible burglary. He shouted into the windowpane opening, identifying himself as a police officer, and upon receiving no reply, left the scene and drove to a callbox to request assistance. Upon his return to the Kraimer home, while waiting for assistance, Frievault talked with one of the neighbors and was advised that the neighbor had seen the Kraimer children playing in the yard over the weekend and expressed no concern about their welfare. At this point, he became suspicious as the school authorities had informed the police that Kraimer had called saying that his children were on a vacation. Frievault testified that at this time there was no way for him to know whether there was a homicide at the defendant's home, where the children were, and further, he was uncertain whether he was investigating a prank call, a burglary or a homicide.

Approximately five minutes thereafter, assistance arrived and Sgt. Robert Holton and Frievault went to the back door and yelled into the house through the open windowpane and again failed to receive a response. The officers' failure to rouse the occupants and the fact that entry into the home could be gained by reaching through the broken windowpane and turning the doorknob made them suspicious of a burglary and persuaded them to go inside to check out the premises. Thus, Frievault and Holton entered the home at this time without a search warrant because of the possibility of a homicide, a burglary or a danger to the children. At the suppression hearing, Frievault stated that his purpose for entering the home was "I was checking for a burglary or whatever this mysterious circumstance was bringing about."

Once inside the home, Frievault testified that he announced their presence and upon receiving no reply, he and Sgt. Holton proceeded to the stairway to the second floor as he was advised that if in fact there was a homicide at this residence, it was likely the woman would be found in the area of the upstairs bathroom. On their way to the stairway, the officers passed through the dining and living rooms and observed a partially eaten pizza, children's shoes on the floor and a television set playing.

Frievault and Holton then ascended the stairs to the second floor and again announced their presence. As they reached the landing between the first and second floors, and hearing footsteps on the first floor, they turned around and came back downstairs. At this time they saw an individual, later identified as Kraimer, sitting on the couch with his children. The defendant spoke first and addressing Sgt. Holton, he said "Hi Bob, thank God you're here. I'm glad it's over." Frievault then inquired whether the defendant was the person who called. Kraimer responded affirmatively and Frievault asked

"Where is your wife?" The defendant stated "She's upstairs in the bedroom." Frievault went upstairs and found Mrs. Kraimer on a bed covered with sheets and blankets. He checked for signs of life and determined that she was dead.

Frievault returned to the first floor and informed Holton that Mrs. Kraimer was dead. The defendant spoke and stated, "I suppose you're going to need the gun." Frievault answered "Yes" and Kraimer said "It's in the basement. I'll take you down there." Frievault testified that the defendant led the officers to the basement and as the three of them descended the stairs, he advised Kraimer that he was under arrest and informed him of his *Miranda* rights. In the basement, the defendant pointed to the ceiling tiles at the foot of the stairs and said the gun was behind them. The three men then returned to the first floor and Frievault finished reading the *Miranda* rights to the defendant as they got to the top of the stairs. Kraimer was asked if he understood his rights and he replied that he did. At this point, Frievault asked Kraimer if he wanted to talk about the incident and the defendant said yes, stating that he wanted "to get the matter over with." Kraimer then handed Frievault some letters and said "they will explain everything."[3] About this time, the defendant also informed Frievault of the location of the unused bullets he had taken from the gun chamber after the shooting. Kraimer then gave statements to the officers and shortly thereafter was conveyed to the police station, where he gave a written confession shortly after his arrival. Subsequently, the body, gun, bullets, letters as well as a pipe that the defendant claimed his wife was brandishing when he shot her, were removed by the police and

---

[3] The defendant later signed an affidavit giving Frievault permission to read these letters.

members of the fire department rescue squad as evidence.[4]

At the suppression hearing, the defendant argued that the police officers' initial warrantless entry into the Kraimer home did not come within any of the exceptions to the Fourth Amendment warrant requirement[5] and thus, all of the evidence obtained must be suppressed.[6] In addition, Kraimer claimed that since the officers failed to apprise him of his *Miranda* rights immediately after they ascertained he was the anonymous caller, all of his subsequent statements must be excluded.

The officers, on the other hand, testified that the initial entry was justified because they were confronted with an emergency situation, namely, a possible burglary or homicide and the suspicious circumstances surrounding the Kraimer children's absence from school. The state contended that the inquiry as to the location of the defendant's wife was only investigatory at this point in time and thus, the officers were not obliged to inform Kraimer of his *Miranda* rights before asking this question.

The trial court denied the motion to suppress stating: (1) the police had probable cause to believe a burglary had been committed and upon failing to arouse the occupants, were justified in entering the house, and (2)

---

[4] The rescue squad was summoned after Frievault checked the status of Mrs. Kraimer.

[5] The defendant bases his claim on the Fourth Amendment to the U. S. Constitution which reads as follows:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[6] The defendant also argued that the phone conversations were intercepted unlawfully, but he has not raised this claim on appeal and therefore we do not address the same.

the question regarding the location of Kraimer's wife was investigatory only, at this time, and thus, the officers were not required to apprise the defendant of his *Miranda* rights before making this inquiry.

Kraimer was tried for first degree murder and the jury found him guilty of the included crime of manslaughter. The defendant appealed the judgment of conviction on the ground that the court erred in denying his motion to suppress. The court of appeals affirmed the conviction, holding that although the initial entry was illegal, the evidence gained thereby was purged of the primary taint of the unlawful invasion as the defendant volunteered the evidence and the police did not exploit the illegality of their presence to obtain it. This court granted the defendant's petition to review the appellate court's decision.

*Issue*

Did the trial court err in denying the defendant's motion to suppress?

On appeal, the defendant makes three claims of constitutional dimension: (1) that the entry into the Kraimer residence was not justified under the emergency exception to a warrant requirement and therefore, all of the evidence obtained should have been suppressed under the "fruit of the poisonous tree" doctrine; (2) if the police were justified in entering the defendant's home, the failure of the police to give Kraimer his *Miranda* rights before asking him about his wife required suppression of all of his subsequent statements; and (3) assuming the initial entry to be unlawful, the defendant's statements to the police when he encountered them in his home were not voluntary and thus, there was neither a consent to the search or a cleansing of the primary taint of the unlawful invasion and therefore, the decision of the court of appeals was in error.

The state, in essence justifies the search and seizure herein on two bases: (1) the officers were confronted with an acute emergency, to-wit: a possible homicide and a danger of harm to the children confined in the home with a possible murderer, thus the initial entry was lawful and the defendant's fruit of the poisonous tree argument must fail; and (2) because the defendant voluntarily consented to the officers' presence in his home, he thereby waived and removed any taint of unlawful invasion and therefore the fruit of the poisonous tree doctrine would be inapplicable as to an illegal entry into the defendant's house.

Thus, we are initially presented with the question of whether the "emergency rule" justified officers Frievault and Holton's entry into the Kraimer residence as an exception to the Fourth Amendment search warrant requirement.

The *emergency doctrine* has been defined generally as follows:

"Law enforcement officers may enter private premises without either an arrest or a search warrant to preserve life or property, to render first aid and assistance, or to conduct a general inquiry into an unsolved crime, provided they have reasonable grounds to believe that there is an urgent need for such assistance and protective action, or to promptly launch a criminal investigation involving a substantial threat of imminent danger to either life, health, or property, and provided, further, that they do not enter with an accompanying intent to either arrest or search." Moscolo, *The Emergency Exception to the Warrant Requirement Under the Fourth Amendment,* 22 Buff. L. Rev. 419, 426 (1972).

The justification for this exception to the warrant requirement has its underpinnings in the Fourth Amendment itself. As we stated in *Bies v. State,* 76 Wis.2d 457, 251 N.W.2d 461 (1977), "The ultimate standard under the Fourth Amendment is the *reasonableness* of the

search or seizure in light of the facts and circumstances of the case. *State v. Elam,* 68 Wis.2d 614, 621, 229 N.W. 2d 664 (1975); *Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S. Ct. 2523, 37 L. Ed.2d 706 (1973)." (emphasis supplied). *Id.* at 468. *See also: State v. Flynn,* 92 Wis.2d 427, 445, 285 N.W.2d 710 (1979) and *State v. Pires,* 55 Wis.2d 597, 609, 201 N.W.2d 153 (1972). The element of reasonableness with regard to the emergency rule is supplied by the compelling need to render immediate assistance to the victim of a crime,[7] or insure the safety of the occupants of a house when the police reasonably believe them to be in distress and in need of protection.[8]

In *LaFournier v. State,* 91 Wis.2d 61, 67, 280 N.W.2d 746 (1979), this court, commenting on *State v. Pires,*

---

[7] *State v. Pires,* 55 Wis.2d 597, 604, 201 N.W.2d 153 (1972); *State v. Davidson,* 44 Wis.2d 177, 194, 170 N.W.2d 755 (1969); *State v. Hoyt,* 21 Wis.2d 284, 296, 128 N.W.2d 645 (1969). It should be noted that the United States Supreme Court has approved of the emergency rule, stating:

"We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises. . . . 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' *Wayne v. United States,* 115 U.S. App. D.C. 234, 241, 318 F.2d 205, 212 (op. of Burger, J.)." *Mincey v. Arizona,* 437 U.S. 385, 392 (1978).

For a collection of cases discussing the emergency rule *see* Moscolo, The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment, 22 Buff. L. Rev. 419 (1972); Note, Warrantless Murder Scene Searches in the Aftermath of Mincey v. Arizona, 58 Wash. U.L.Q. 367 (1980). *See also:* 2 La Fave, Search and Seizure sec. 66.6 (1978).

[8] *See: West v. State,* 74 Wis.2d 390, 400, 246 N.W.2d 675 (1976).

*supra,* stated "We have recognized an 'emergency rule exception' that neither the Fourth Amendment nor the Wisconsin Constitution bars peace officers from making warrantless entries where they reasonably believe that a person within is in need of aid." We held "that in the instant case an entry to locate and aid the victim [of drug overdose] required no warrant. . . ." *LaFournier, supra* at 71.

Most recently, in *State v. Prober,* 98 Wis.2d 345, 297 N.W.2d 1 (1980), this court adopted a two-step analysis for determining when a warrantless search that is claimed to be justified under the emergency doctrine would be reasonable and therefore valid. Under this analysis, the exigency of the situation confronting the police is tested both objectively and subjectively. In *Prober* we stated:

"First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, even though the requisite motivation is found to exist, until it can be found that a reasonable person under the circumstances would have thought an emergency existed, the search is invalid. Both the subjective and objective tests must be met." *Id.* at 365.

Thus, the determination of whether the emergency exception to the search warrant requirement applies in this case requires the resolution of two issues: (1) were Officers Frievault and Holton actually motivated by a perceived need to render aid or assistance, and (2) were the circumstances confronting these officers at the time they entered the Kraimer residence such that a reasonable person would have believed that an emergency existed. *Prober, supra* at 360–66. The search sought to be justified under the emergency exception must be held invalid unless both of these questions are answered affirmatively. *Id.* In other words, the search was valid if

the officers subjectively perceived a need to render immediate aid or assistance and intended to do so when they entered the defendant's home, *and* the facts, viewed objectively, support the conclusion that the officers had probable cause to believe there was an emergency at hand and immediate action was needed for the protection of life or property.

Before examining the applicability of the *Prober* emergency doctrine, we note that the defendant cites only the *general rules* applicable to search and seizures, namely, that searches conducted without warrants are *per se* unreasonable and the burden of showing that a case falls within an exception is upon the state. *Bies v. State, supra* at 463, citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454, 455 (1971) and *Pires, supra* at 603. Further, Kraimer directs our attention to the principle ". . . that there are recognized distinctions in the appropriate levels of protection afforded by the Fourth Amendment to different forms of intrusion. *Wendricks v. State,* 72 Wis. 2d 717, 722, 242 N.W.2d 187, 190 (1976). The highest level of protection is afforded to a dwelling place. *See: State v. Pires,* 55 Wis.2d 597, 604, 201 N.W.2d 153, 157 (1972)." *State v. Monahan,* 76 Wis.2d 387, 395, 251 N.W.2d 421 (1977).

We are cognizant of the foregoing *general rules,* but as both parties agree that the question with regard to the initial entry of Kraimer's home is whether the emergency doctrine is applicable, the general rules are of little aid in this analysis for the test of the applicability of the emergency doctrine is that set forth in *Prober.*

Turning to the subjective step of the *Prober* analysis, we note that the trial court failed to make a finding as to the actual motivation of the officers at the time of their entry into the defendant's home. We wish to point out, however, that this was not required of the trial court on the date of the suppression hearing as the

*Prober* decision was rendered subsequent thereto. Thus, we are presented with a preliminary issue of whether this court can make its own finding as to the subjective intent of the officers at the time they entered the defendant's home.

In *Barnes v. State,* 25 Wis.2d 116, 130 N.W.2d 264 (1964), this court stated:

"In the instant case we do not have the benefit of any finding of fact by the trial court with respect to whether or not defendant voluntarily consented to the search. *We, therefore, must make our own determination of this factual issue upon the evidence before us."* (Emphasis supplied.) *Id.* at 122.

*Barnes, supra,* was followed by *Howland v. State,* 51 Wis.2d 162, 186 N.W.2d 319 (1971), where the trial court again ruled that evidence alleged to have been obtained as a result of a warrantless search was admissible in the absence of specific findings of fact. In *Howland, supra,* this court, after an independent review of the record, concluded ". . . that the evidence adduced at the pre-trial hearing would support only one of two possibilities. Either the defendant voluntarily produced the boots [evidence seized] himself or he consented to a search in which the boots were discovered [in plain view]." *Id.* at 170. Thus, it held that "the trial court's ruling on the admissibility of the boots was correct and supported by adequate credible evidence." *Id.*

Thus, this court has held that when a trial court has not made an ultimate finding of fact on the issue of whether the defendant voluntarily consented to a search, it *must* make its own independent determination on that particular factual question upon the evidence contained in the record. *Howland, supra; Barnes, supra.* Moreover, it is important to note that this court has also held:

"On review of an order suppressing evidence, the findings of fact, *if any,* of the trial court will be sustained unless against the great weight and clear preponderance of the evidence. *State v. Pires, supra,* 55 Wis.2d at 602, 603. *However, this court will independently examine the circumstances of the case to determine whether the constitutional requirement of reasonableness is satisfied. See State v. Carter,* 33 Wis.2d 80, 89–96, 146 N.W.2d 466 (1966), *cert. denied* 387 U.S. 911; *Ker v. California,* 374 U.S. 23, 33, 34, 83 S. Ct. 1623, 10 L. Ed.2d 726 (1963)." (Emphasis supplied.) *Bies, supra* at 469.

Although *Howland, supra,* and *Barnes, supra,* involved the issue of consent to search, we believe that the question of the officers' actual motivation in entering the Kraimer home is analogous to that of a defendant's consent to a search and thus under *Barnes, supra,* this court *must* make its own independent determination of this factual issue upon the evidence. Since *Prober* sets forth the test for determining whether the *reasonableness* requirement is met where the emergency exception is invoked to justify a warrantless search, under *Bies, supra,* we are, in any event, obliged to make an independent examination of the facts of this case to ascertain if the *Prober* two-step analysis is satisfied.

Of the two officers who made the initial entry into the defendant's home, Frievault was the only one to testify at the suppression hearing. Frievault stated that he entered the Kraimer residence to investigate the status of Kraimer's wife and/or a possible burglary and to ascertain as to the welfare of Kraimer's children. Indeed, the fact that Frievault discussed the well-being of the defendant's children with one of his neighbors and his testimony that his suspicions were aroused when the neighbor stated she saw the children over the weekend because the school authorities had advised the police the children were reported to be on vacation, clearly demonstrates that he was concerned for their safety. As

recited in his testimony, Frievault's purpose in entering the Kraimer residence was to investigate the status of the defendant's wife or a possible burglary. Further, Frievault's actions illustrate that he was concerned with a possible homicide as immediately upon entering the house, he proceeded to the second floor bathroom as he was told that if this were a homicide, the victim would most likely be found in that area. Additionally, the fact that Frievault's first question to the defendant after he ascertained that the defendant was the caller was "Where is your wife?" rather than "Where is the body?" or "Did you kill your wife?" illustrates that Frievault's main purpose was not to secure evidence of a crime, but, rather, was one of determining Mrs. Kraimer's condition and assisting her if in fact she was still alive. Thus, upon finding her in an upstairs bedroom, Frievault's initial action was to check for signs of life, as it was his duty to determine whether she was dead or alive.

In *Prober* we recognized that ". . . there are inherent difficulties in assessing the purpose of a search, . . ." *Id.* at 366, but stated that this determination could best be made from an analysis of the officer's testimony and the manner in which he conducted the search. *Id.* We also stated "Conduct by the searching officer which is inconsistent with the purported reason for entry is cause for skepticism." *Id.*

Frievault's testimony relating his conduct prior to and upon entering the defendant's residence demonstrates that he was actually motivated by a perceived need to render immediate aid and assistance to the defendant's wife, if alive, as well as to protect and insure the Kraimer children from the obvious risk of possible serious harm from their emotionally upset and distraught father. For, all too frequently, one who kills his wife will also kill himself as well as his children.[9] Thus, this case is dis-

---

[9] In fact, the letters that the defendant gave to Officer Frievault stating that they would explain everything indicated that he

tinguishable from *Prober*, for in *Prober* the searching officer testified no less than three times that the sole purpose for the search was to inventory the contents of the defendant's car. *Id.* at 364, 366.

The defendant argues that Frievault's conduct in driving to a call box to request assistance and waiting until the assistance arrived before he entered the defendant's home illustrates that Frievault did not believe he was confronted with an emergency situation requiring immediate action. Further, he argues that Frievault was not concerned with the well-being of Kraimer's children because he did not inquire as to their status after encountering Kraimer in his living room.

Although it is clear that the emergency exception is based upon the perceived need to take immediate action, i.e., the officer must be confronted with what he believes to be an *exigent* situation, the totality of the circumstances surrounding Frievault's conduct unequivocally demonstrated a belief that there was a need for prompt response to a perceived emergency not only involving the defendant's wife but his children as well. Indeed, given that there existed a possibility that Frievault would be confronted with an emotionally upset or distraught and potentially psychotic individual, it was his duty to call for assistance or take some other reasonable precautionary measure to protect against a risk of serious harm to the children as well as himself. Additionally, the fact that Frievault did not ask Kraimer where his children were does not support the defendant's claim as he saw the children at the same time he saw Kraimer, and thus there was no need to question Kraimer with regard to his chil-

had indeed contemplated such action. Although the Racine Police Department was not privy to this information at the time they entered the defendant's abode, these letters confirm the fact that a call of this nature requires immediate action on the part of the police if they are to prevent a multiple tragedy.

dren for Frievault could determine for himself whether or not they were in need of aid or assistance at that time. Hence, the record clearly demonstrates a subjective belief on the part of Officer Frievault that he was confronted with an emergency and that his entrance into the Kraimer home was for the purpose of rendering aid to the victim of a reported homicide and protecting and insuring the safety of the defendant's children. Therefore, we hold that the subjective portion of the *Prober* test is satisfied in this case.

The question with regard to the objective step of the *Prober* analysis is whether a reasonable peace officer would, under the circumstances, have had reason to believe that an emergency existed at the Kraimer home. The circuit court found that the entry was justified because the officers had probable cause to believe that a burglary had taken place.[10] On appeal, the state does not abandon the burglary theory even though they did not address this possible justification for the entry before this court. Rather, as noted above, it claims that the entry was lawful because the officers had probable cause to believe the report of a possible homicide at the Kraimer home. Thus, not knowing the condition of Kraimer's wife, the officers could reasonably conclude that an emergency existed because it was necessary for them to gain immediate entry to determine the status of the victim (Mrs. Kraimer) as well as to investigate and protect the welfare of the defendant's children. Although the state does not abandon the burglary theory, it contends that there is no need to consider this theory because the entry was justified on the ground that the police had probable cause to believe there had been a possible homicide at the Kraimer home. Thus, we must

---

[10] *See:* 2 La Fave, *Search and Seizure,* §6.6(b) (1978) stating that the exigent circumstances exception extends to the situation where the police reasonably believe that the premises have recently been or are being burglarized.

consider whether the Racine Police Department had probable cause to believe there was a homicide at the Kraimer residence, for as the state contends, if probable cause existed as to a homicide, there is no need to consider the burglary theory.

The defendant counters the state's homicide emergency argument claiming that the information possessed by the police officers before they entered the Kraimer abode, when viewed objectively, did not support a reasonable belief that the defendant's home was the locus of the reported homicide or that the officers were confronted with an emergency and, therefore, the second step of the *Prober* test has not been met. Additionally, the defendant contends that the circuit court found that there was no probable cause to justify the entry on a homicide theory and thus we are bound by this finding unless it is contrary to the great weight and clear preponderance of the evidence. *Bies, supra; Pires, supra.* In support of the latter claim, Kraimer refers us to the following statements by the trial court:

"I think there is one thing I'd like to clarify so your argument will stay with what I feel is important. They had no information. They [the police] had a phone call saying that perhaps somewhere in the city there was a wife in the bedroom. They had no information that in the Kraimer home there was a wife in the bedroom.

"He [Frievault] did not know whether or not there was this phone call that they had received actually—actually reported a homicide or not. He did not know if he was dealing with a crank. He did not know what was occurring, whether it required further investigation to see, do I have a crime here or don't I have a crime here? . . . He didn't know whether he was dealing with a crime in which Mr. Kraimer was involved or not."

Thus, we must initially determine whether the trial court's statement quoted above constitutes a finding that the police did not possess probable cause to believe that a homicide had been committed and that the defendant's

home was the situs of the reported crime. The defendant emphasizes the court's language to the effect that Frievault had no actual *knowledge* that a homicide had taken place at the Kraimer residence.

"The requirement of probable cause does not demand that [the searching officer] have had knowledge showing that there had been a [homicide in the defendant's home] beyond a reasonable doubt." *Bies, supra* at 475. Thus, since the above quoted trial court statements refer only to an absence of *knowledge*, the defendant's claim that they constituted a finding of no probable cause as to a homicide at the Kraimer residence lacks merit. Therefore, in the absence of a finding by the trial court on this factual issue, we must independently review the record to determine whether the police had probable cause to believe that a homicide had taken place at the Kraimer home. *See: Barnes, supra.*

"The test of probable cause is whether the [officers] had knowledge that would lead a reasonable police officer to believe it *probable* that [an emergency existed]" (citation omitted). *Bies, supra* at 475. The probable cause requirement "must be applied by reference to the circumstances then confronting the officer, including the need for prompt assessment of sometimes ambiguous information concerning potentially serious consequences." 2 La Fave, *Search and Seizure,* §6.6(a) (1970). Along this line of reasoning, this court has stated:

"Police have the right to undertake *'legitimate and restrained investigative conduct . . . on the basis of ample factual justification'* even though that justification falls short of what would be required to support arrest or formal search. *Terry v. Ohio,* 392 U.S. 1, 15, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968). In *Terry* the Court recognized the existence of
" '[a] rubric of police conduct . . . which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct

involved . . . must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.' 392 U.S., at 20.

" . . .

"In *Browne v. State*, 24 Wis.2d 491, 507, 129 N.W.2d 175 (1964), cert. den. 379 U.S. 1004, this court acknowledged that police may investigate claims of crime on evidence not sufficient to justify an arrest, and stated:

" 'Although the Fourth Amendment and sec. 11, art. I [Wis. Const.] protect against police invasion of privacy, *police officers should be permitted to conduct a reasonable investigation when their suspicion has been reasonably aroused. Whether an inquiry is considered reasonable must depend upon the facts in each case and must turn on the application of what is essentially an indeterminate and flexible test.'*

"The standard is an objective one:

" '[W]ould the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" that the action taken was appropriate.' *Terry v. Ohio, supra,* 392 U.S. at 21, 22.

" '[I]n determining whether the officer acted reasonably . . . due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.' *Id.,* at 27." (Emphasis supplied.) *Bies, supra* at 465–66.

Thus, the inquiry here is whether upon an objective analysis of the circumstances confronting Officers Frievault and Holton, including the nature and reliability of their information, it can be said that their investigative conduct was supported by a reasonable belief that an emergency existed. *Prober, supra* at 365; *Bies, supra* at 469.

The state claims that the probable cause requirement of the *Prober* emergency rule is satisfied in this case because the police had credible information that a possible unnatural death may have occurred in the defendant's home and that this situation, combined with the

defendant's upset and distraught mental condition, posed a danger to the children. Kraimer's reply to the state's argument is that the facts in this case do not support a finding of probable cause of the existence of an emergency at his residence. He, in essence, maintains that the anonymous calls were not credible, but even if credible, the police did not have probable cause to believe that the Kraimer abode was the home of the caller. He claims that the information gained from the local schools had no bearing on either the credibility of the caller or the existence of an emergency at the caller's home. Further, he argues that since the caller said that he killed his wife four days ago, no emergency existed.

The defendant's assertion that the information gained from the telephone calls was not credible rests primarily upon this court's statement in *Bies, supra* at 470, that since information received in that case was from ". . . an anonymous telephone caller; it therefore was not possessed of even minimal 'indicia of reliability.' " *Bies* is clearly factually distinguishable from this case. In *Bies, supra,* the police received one anonymous call that someone was making noise shortly after midnight in an alley located near the defendant's premises. Upon reaching the alley, the officers observed a light in the defendant's garage go out. Believing that this was a response to their presence, the officers became suspicious and upon further investigation, observed what they believed to be stolen telephone cable in the defendant's garage.

In this case, the police received not one but three anonymous calls. Further, the calls were urgent requests for help and constituted an admission against the caller's penal interest. Under these circumstances, we believe the statement in *Bies* to be inapplicable for the calls herein, although anonymous, can be said to have possessed sufficient indicia of reliability because of the fact that the caller made three calls requesting assistance and that he

admitted shooting his wife, a statement that people do not lightly undertake to make. Further, the fact that the police obtained the names of three families with three school age children with the eldest being twelve absent that day corroborates the information received from the caller.

Turning to the defendant's claim that the police had no reason to believe that the Kraimer residence was the home of the caller, we note that the police had contacted the local elementary schools to ascertain whether their absentee records for that day could give them any leads to match the information the defendant gave them regarding his children. The school authorities gave the police three leads as to possible homes involved, two of which were eliminated after investigation, before the police went to the defendant's home. The officers, as a result of prompt and thorough police work, received corroborating information from the local schools with regard to the defendant's children being absent. The following facts are determinative of the probable cause issue: (1) three phone calls for help from an emotionally upset individual who reported shooting his wife and who stated that his four children, three of whom might possibly be of school age, were home with him; (2) a report from school authorities stating that the Kraimer children were on vacation; (3) an investigation that gave rise to three leads on the basis of the information regarding the defendant's children; and (4) the elimination of two of the leads leaving only the defendant. We hold that a reasonable police officer possessing this information would believe it *probable* that an emergency existed because further and immediate investigation was necessary in order to render aid to Mrs. Kraimer, if alive, and to insure the safety of the Kraimer children. Thus, the

second step of the *Prober* analysis has been satisfied, and, therefore, the initial entry into the Kraimer abode was justified under the emergency exception.

The defendant's claim that the police had no reason to believe an emergency existed because the caller reported his wife was dead for four days lacks merit for it ignores the testimony of Officer Frievault that when he went to the Kraimer home in response to three phone calls from a highly emotional and distraught individual that "there was no way for *me to know that* there would have been a homicide at that home." Additionally, this contention overlooks the risk of serious harm to the defendant's children, for as noted above, it is not uncommon for a man in Kraimer's emotionally upset and distraught condition to take his own life as well as his children's. Moreover, as stated by the Delaware Court:

"Frequently, the report of death proves inaccurate and a spark of life remains, sufficient to respond to emergency police aid. As a general rule, we think an emergency may be said to exist, within the meaning of the 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have, occurred. And, the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact." (Citations omitted). *Patrick v. State,* 227 A.2d 486, 489 (Del. 1967).

Thus, although the caller reported that his wife was dead for four days, the police had no way of knowing this as a verity and therefore an emergency existed because ". . . apparent death may turn out to be barely surviving life, still to be saved." *State v. Epperson,* 571 S.W.2d 260, 264 (Mo. 1978).

Having concluded that the initial entry was lawful, the defendant's fruit of the poisonous tree claim must fail,

and therefore, the trial court did not err in denying the defendant's motion to suppress the physical evidence.[11]

We now turn to the defendant's claim that his *Miranda* rights were violated by the failure of the officers to inform him of these rights before asking where his wife was. The trial court found that this inquiry into the location of the defendant's wife was investigatory rather than accusatory and thus, *Miranda* did not apply.

This issue is controlled by our holding in *Britton v. State,* 44 Wis.2d 109, 170 N.W.2d 785 (1969). In that case a police officer arrived at the scene of a shooting shortly after it occurred and was informed that the assailant had just run into a gangway between two nearby houses. The officer gave chase and saw a man coming from the door of a house as he reached the end of the gangway. He asked the man if he had been involved in the shooting and the man replied "Yeah, I shot him." This court held that the trial court did not err in denying the defendant's motion to suppress this statement because it was completely voluntary and not made in response to any custodial interrogation. We observed that the officer was merely attempting to sort out the facts and that the question was a natural and spontaneous reaction to the circumstances before him. Thus, we concluded that:

"The officer had not proceeded beyond general on-the-scene questioning which is specifically exempted in *Miranda:*

" 'Our decision is not intended to hamper the traditional function of police officers in investigating crime.

---

[11] We need not address the parties' attenuation and purgation of taint arguments as those contentions presuppose an unlawful entry. Further, we need not consider whether probable cause existed as to the burglary theory since the second step of the *Prober* test is satisfied by the probable cause to believe that an emergency existed at the Kraimer home.

See *Escobedo v. Illinois.* . . . When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. *General on-the-scene questioning as to facts surrounding a crime* or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.' (emphasis added). *Miranda, supra,* pp. 477, 478.

" 'In announcing these principles, we are not unmindful of the burdens which law enforcement officials must bear, often under trying circumstances. We also fully recognize the obligation of all citizens to aid in enforcing the criminal laws. This Court, while protecting individual rights, has always given ample latitude to law enforcement agencies in the legitimate exercise of their duties. The limits we have placed on the interrogation process should not constitute an undue interference with a proper system of law enforcement. As we have noted, our decision does not *in any way* preclude police from carrying out their traditional investigatory functions.' (Emphasis added.) *Miranda, supra,* p. 481." *Britton, supra* at 113–14.

In the present case, Frievault's question "Where is your wife?" was a natural reaction to the situation confronting him. After ascertaining that Kraimer was the caller, the question "Where is your wife?" was merely an attempt to discover her whereabouts, for at this point in time, Officer Frievault did not know whether Mrs. Kraimer was alive or dead. Indeed, since Frievault was investigating a reported emergency, his query can only be viewed as a general-on-the-scene questioning in order to determine whether in fact Mrs. Kraimer was present and in need of assistance.

Thus, we conclude that the officers were not required to advise the defendant of his constitutional rights and

*Miranda* did not apply at the time Frievault asked this question because he was performing an investigation of a reported emergency and crime. Therefore, we hold that the court's failure to suppress the defendant's statement was not error.

*By the Court.*—Decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). I agree that the decision of the court of appeals should be affirmed. I do not agree that this record satisfies the subjective prong of the *State v. Prober,* 98 Wis.2d 345, 365, 297 N.W.2d 1 (1980), test. On the facts before us, I would employ the analysis used by the court of appeals, *see State v. Kraimer,* 91 Wis.2d 418, 283 N.W.2d 438 (Ct. App. 1979), to decide this case.